United States Court of Appeals
Fifth Circuit

**F I L E D**

**April 15, 2004**

Charles R. Fulbruge III
Clerk

**REVISED APRIL 29, 2004**
IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 03-30518
_____

COOPERATIVE BENEFIT ADMINISTRATORS, INC.,
In Its Capacity as a Named Fiduciary of
the National Rural Electric Cooperative
Association Long-Term Disability Plan,

                    Plaintiff - Counter Defendant - Appellee,

versus

DALE R. OGDEN,

                    Defendant - Counter Claimant - Appellant.

---------------------
Appeal from the United States District Court for the Middle
District of Louisiana
---------------------

Before HIGGINBOTHAM, SMITH, and  WIENER, Circuit Judges.

WIENER, Circuit Judge:

    Defendant-Appellant Dale Ogden appeals the district court's
grant of the summary judgment motion of Plaintiff-Appellee
Cooperative Benefit Administrators, Inc. ("CBA"), enforcing terms
of an ERISA-governed long-term disability plan against her and
dismissing her counterclaim for benefits.  Ogden also appeals the
district court's denial of her motion to dismiss for lack of
subject matter jurisdiction and for failure to join her daughters
as indispensable parties, as well as the court's denial of her

motion for partial summary judgment.  For the following reasons, we reverse the district court's denial of Ogden's motion to dismiss, albeit not on jurisdictional grounds; we render a judgment of dismissal, but for failure to state a claim in federal common law; and we affirm the district court's dismissal of Ogden's counterclaim for benefits.

## I. FACTS AND PROCEEDINGS

The National Rural Electric Cooperative Association ("NRECA") is a trade association for more than 1,000 rural electric cooperatives throughout the United States. CBA is the claims adjudicator for NRECA's Group Benefits Program, a multiple-employer benefits plan sponsored by NRECA for its member cooperatives.  This Program consists of five welfare benefits plans, including a self-insured Long-Term Disability Benefits Plan ("the Plan") governed by the Employee Retirement Income Security Act of 1974 ("ERISA").[1]  As claims adjudicator for the Program, CBA is also an ERISA fiduciary as defined by § 1102(a).[2]  Ogden is a former employee of Cajun Electric Power Cooperative, Inc., one of NRECA's member cooperatives, and was a participant in the Plan at all relevant times.  After sustaining non-work related injuries that rendered her totally disabled, Ogden filed a claim in April 1995 seeking long-term disability benefits under the Plan.  Within three weeks,

---

[1] See 29 U.S.C. §§ 1002(1), et seq.

[2] See 29 U.S.C. § 1102(a).

2

CBA approved her request and began paying Ogden the full amount of her benefits under the Plan.

The Plan documents contain a "Benefit Offset" provision that allows CBA, as plan fiduciary, to estimate the amount of benefits a participant is eligible to receive from sources outside the Plan[3] and to deduct — or "offset" — the combined amount of these outside benefits from the amount that the participant is entitled to receive under the Plan. Benefits from outside sources that were subject to offset included "any payments [from other sources]. . . whether the payment is made to, or on behalf of, the Participant, the Participant's spouse or any dependent of the Participant." As there is often a substantial delay between the time that a participant becomes eligible for outside benefits and the time that such benefits are actually paid to the participant, the Plan also gives CBA the option of advancing to a participant the full amount of his Plan benefits, without offset, conditioned on the participant's agreeing to reimburse the Plan the amount of the advances attributable to eventual receipts of outside benefits. To reinforce a participant's reimbursement obligation, the Plan requires him to sign a Reimbursement Agreement ("Agreement"), the

_____

[3] The following outside sources are subject to offset under the Plan: (1) workers' compensation benefits, (2) welfare benefits to which the participant may be entitled to receive under the terms of an employee benefit plan other than one sponsored by the NRECA Group Benefits Program, (3) benefits under state or federal law, (4) wage payments, (5) pension payments, (6) life insurance disability payments, (6) Social Security Retirement benefits, and (7) Social Security Disability benefits.

3

terms of which are stated in the plan documents, obligating the participant both to cooperate with CBA in pursuing benefits from outside sources and to reimburse the Plan the amount of the advances within 30 days following receipt of any benefits from outside sources. The Agreement specifies that, if the participant fails to repay the Plan within thirty days for amounts previously advanced, the participant is liable to the Plan for the full amount of the advances, plus interest and any costs or attorney's fees incurred by CBA in enforcing the Agreement. If a participant refuses to reimburse the Plan in accordance with the provisions of the Agreement, CBA is authorized by the Plan to reduce —— "setoff" —— reimbursements owed to it by the participant against future monthly benefits as they become due.

In June 1995, CBA learned that Ogden and her two dependent daughters had become eligible to receive Social Security disability benefits, which, as we have noted, are among the types of outside benefits that are subject to the Plan's offset provisions.[4] Consequently, CBA informed Ogden that it would begin offsetting the estimated amount of her and her daughters' anticipated Social Security disability benefits against her monthly benefits under the Plan, unless she agreed to provide CBA with a copy of her Social Security application and sign a Reimbursement Agreement as required

---

[4] The Plan defines Social Security disability benefits to include "benefits paid to the Participant's spouse or children on account of the Participant's employment and earnings record."

4

by the Plan.  Ogden opted to sign the Agreement and continue to receive the full amount of her benefits without offset.  In the Agreement, Ogden promised

> [t]o repay CBA the amounts advanced to [her] in accordance with the offset provisions of the [LTD] plan and this Reimbursement Agreement within 30 days of [her] receipt of the proceeds of any benefits, awards, or payments recovered from Social Security . . . The repayment will not exceed the amount of the benefits, awards, or payments recovered from Social Security, except that it shall include interests, costs, and attorney's fees as provided in this RA.

In October 1996, CBA informed Ogden that she had become eligible to receive her retirement pension and that her total monthly benefits under the Plan would be offset by $66.52, the full amount of her monthly pension payments.  Thus, her total monthly benefits from the Plan were reduced from $996.77 to $930.25, starting with her November 1996 payment.

Initially, the Social Security Administration ("SSA") denied Ogden's claim.  CBA subsequently offered to hire Allsup, Inc. to pursue the claim on Ogden's behalf.  Ogden accepted this offer, and CBA paid all expenses related to Allsup, Inc.'s representation. The SSA finally approved Ogden's claim for disability benefits in October 1997, more than two years after she had submitted her application. Shortly thereafter, the SSA issued Ogden a Notice of Award, stating that she was entitled to monthly Social Security disability benefits of $844, starting the following month, plus a lump-sum payment of $26,808 for retroactive disability payments for

5

the period April 1995 through October 1997.  The SSA also informed Ogden that her two daughters, both of whom had attained majority after Ogden's application was filed and were thus no longer her dependents, would each receive lump-sum payments totaling $27,624 for the same period.

The present controversy arose when, after receiving her lump-sum Social Security award, Ogden refused to reimburse the Plan $27,291.29 to cover advances that she owed under the terms of the Plan and the Agreement.  Although CBA began suspending Ogden's benefits in December 1998 through the exercise of its setoff rights, it continued to seek reimbursement from Ogden from her lump-sum award.  In April 2000, after several attempts to obtain reimbursement failed, CBA filed suit in district court for $27,693.86 in benefit "overpayments."  Because Ogden's daughters had not, at that time, received their lump-sum Social Security awards, CBA based its demand on the amount of Ogden's lump-sum award and the estimated amount of her daughters' anticipated lump-sum awards, plus pre-judgment interest at eight percent, post-judgment interest, and attorney's fees and costs.

In July 2000, the SSA paid Ogden's two major daughters lump sums of $26,994 and $630, respectively.  CBA subsequently amended its complaint to state a demand for $22,784.74, an amount that reflected both the sums it had recouped from Ogden since December 1998 as a result of its suspension of her plan benefits under the setoff provision and the sums her daughters had actually received.

CBA premised subject matter jurisdiction on two separate grounds: (1) ERISA § 502(a)(3),[5] which authorizes a plan fiduciary to bring a civil action for equitable relief to enforce the terms of the plan, and (2) the federal common law of unjust enrichment as applied to ERISA.

Ogden answered the complaint and counterclaimed for back benefits allegedly owed to her from May 2000 to date, plus attorney's fees and costs. She then filed a motion to dismiss CBA's complaint for lack of subject matter jurisdiction on the basis that CBA had failed to state a statutory claim for equitable relief under § 502(a)(3) and that federal common law could not be invoked to provide CBA with a remedy. That motion also included an alternative Rule 12(b)(7)[6] motion to dismiss CBA's complaint for failure to join her daughters as indispensable parties under Rule 19.[7]

While these motions were still pending, Ogden filed a motion for partial summary judgment on the merits of CBA's claims, asserting, inter alia, that she could not be held liable under the

---

[5] See 29 U.S.C. § 1132(a)(3). ERISA § 502(a)(3) authorizes a civil action "by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this title or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this title or the terms of the plan[.]" 29 U.S.C. § 1132(a)(3).

[6] Fed. R. Civ. P. 12(b)(7).

[7] Fed. R. Civ. P. 19.

7

terms of the Agreement for the Social Security awards received by her daughters, as they were no longer her dependents when they received those awards. Specifically, Ogden requested that the district court (1) dismiss CBA's reimbursement action on the merits, (2) declare that CBA erred in offsetting her plan benefits by the amount of her retirement pension, and (3) declare that CBA had accepted her alleged offer to pay the amount she owed to the Plan through setoff of her plan benefits. CBA then filed a cross-motion for summary judgment on the merits of its claims and on Ogden's counterclaim for benefits.

In January 2002, after both sides had filed their dispositive motions, the Supreme Court issued its decision in <u>Great-West Life & Annuity Insurance Co. v. Knudson</u>, which further defined the scope of § 502(a)(3)'s equitable relief provision.[8] Subsequently, the parties filed supplemental memoranda addressing <u>Knudson</u>'s impact on CBA's reimbursement claim.

In March 2003, the district court heard oral argument on Ogden's motions to dismiss and for partial summary judgment, as well as on CBA's cross-motion for summary judgment. During the course of the proceedings, CBA conceded that it had failed to state a viable claim for equitable relief under § 502(a)(3), after which the district court dismissed that claim. The court ruled, however, that the dismissal of CBA's statutory claim did not preclude the

---

[8] 534 U.S. 204 (2002).

8

exercise of federal question jurisdiction under § 1331, theorizing that CBA had a right to assert a federal common law claim grounded in unjust enrichment.[9]

The district court then denied Ogden's Rule 12(b)(7) motion, reasoning that, unlike their mother, Ogden's daughters were not contractually bound by the Agreement to repay the amounts advanced to Ogden by the Plan and thus were not indispensable parties to the suit. Finally, the district court denied Ogden's motion for partial summary judgment and granted CBA's cross-motion for summary judgment, concluding that Ogden had failed to raise a genuine issue of fact regarding CBA's unjust enrichment claim and that her counterclaim was barred for failure to exhaust administrative remedies.

The district court entered judgment against Ogden for $22,784.74, plus attorney's fees, costs, and interest at the rate of eight percent per annum, compounded annually, from the date on which Ogden and her daughters had received their Social Security disability benefits. It is from this judgment that Ogden timely filed a notice of appeal.

**II. ANALYSIS**

**A. Standard of Review**

---

[9] <u>Frank v. Bear Stearns & Co.</u>, 128 F.3d 919, 922 (5th Cir. 1997) ("[f]ederal question jurisdiction may exist over claims arising under federal common law"); <u>see</u> 28 U.S.C. § 1331.

9

We review de novo both a denial of a motion to dismiss and a grant of a motion for summary judgment.[10]

## B. CBA's Federal Common Law Claim

As noted, CBA's complaint alleged two alternative bases for jurisdiction: (1) a statutory claim for equitable relief under § 502(a)(3), and (2) a federal common law claim of unjust enrichment. As CBA conceded that it could not maintain its claim for equitable relief under § 502(a)(3), we need not address it except to note that, in seeking to impose personal liability on Ogden to enforce her "contractual reimbursement obligation under the LTD Plan and the Reimbursement Agreement," CBA was requesting precisely the kind of "legal" remedy that the Supreme Court has held to be beyond § 502(a)(3)'s jurisdictional grant.[11]

As the district court correctly ruled, however, CBA's failure to state a statutory cause of action under ERISA does not bar federal subject matter jurisdiction over its unjust enrichment claim under federal common law. Indeed, the Supreme Court has made clear that federal question jurisdiction may exist over claims

---

[10] See Benton v. United States, 960 F.2d 19, 21 (5th Cir. 1992) (per curiam).

[11] See Knudson, 534 U.S. at 210, 221 (an action that seeks "to impose personal liability on [a defendant] for a contractual obligation to pay money" is "legal" in nature and unauthorized by § 502(a)(3)); see also Bombardier Aerospace Employee Welfare Benefits Plan v. Ferrer, Poirot & Wansbrough, P.C., 354 F.3d 348, 356 (5th Cir. 2003); Bauhaus USA, Inc. v. Copeland, 292 F.3d 439, 444 (5th Cir. 2002).

10

arising under federal common law.[12]  Nevertheless, simply because federal courts have subject matter jurisdiction over CBA's action to determine the existence of a federal common law remedy of unjust enrichment on CBA's behalf does not mean that CBA has successfully stated a federal common law cause of action for unjust enrichment.[13] In cases such as this, for which Congress has empowered the judiciary to create federal common law pursuant to federal legislation, the ability of a plaintiff to state a federal common law cause of action depends on the existence of a "gap" in the text of that legislation that allows for the creation of the federal common law remedy sought by the plaintiff.[14]

Our holding in Frank v. Bear Stearns & Co. to the effect that federal question jurisdiction did not exist because the plaintiff's

---

[12] See Illinois v. Milwaukee, 406 U.S. 91, 100 (1972) ("We see no reason not to give 'laws' its natural meaning, and therefore conclude that § 1331 jurisdiction will support claims founded upon federal common law as well as those of a statutory origin." (citation omitted)); see also Frank, 128 F.3d at 922.

[13] See, e.g., Airco Indus. Gases, Inc. Div. of BOC Group , Inc. v. Teamsters Health & Welfare Pension Fund, 850 F.2d 1028, 1032 (3d Cir. 1988) ("[t]he question of whether the district court had subject matter jurisdiction pursuant to [28 U.S.C. § 1331] is not whether [the plaintiff-employer] had a valid cause of action against the [defendant-plan] under federal common law . . . [but] [r]ather . . . whether the determination of the existence vel non of that cause of action is a question "arising under . . . the laws . . . of the United States.") (citing 28 U.S.C. § 1331) (1982)).

[14] Jamail, Inc. v. Carpenters Dist. Council of Houston Pension & Welfare Trusts, 954 F.2d 299, 303 (5th Cir. 1992) ("Whenever Congress enacts complex comprehensive legislation, such as ERISA, minor gaps in the legislation are unavoidable . . .[,][and] [i]t is the judiciary's role . . . to fill in these gaps.").

11

complaint did not state a claim under federal common law is not to the contrary.[15] In the instant case, our power to create federal common law is premised on congressional authorization to fill interstitial gaps in the text of federal legislation, here, ERISA. Accordingly, we have jurisdiction over the action to construe that legislation to determine the existence of a federal common law cause of action on CBA's behalf. By contrast, the issue in <u>Frank</u> was whether the plaintiff's state law claims implicated "federal common law issues" because their resolution required interpretation of a federal contract.[16] Thus, in <u>Frank</u> we did not have congressional authorization to make substantive rules pursuant to a federal statute, and we could exercise federal question jurisdiction over the action only if we found that the action fell within "the narrow class of cases where federal rules are necessary to protect uniquely federal interests."[17] As the action did not fall within that narrow class of cases, we concluded that federal common law did not "exist" in the case, and thus there was no basis for federal question jurisdiction.[18]

More to the point of today's inquiry, we have held that federal common law may be applied to fill "minor gaps" in ERISA's

---

[15] <u>See</u> 128 F.3d at 924.

[16] <u>See</u> <u>id.</u> at 922.

[17] <u>See</u> <u>id.</u> at 923 (citations omitted).

[18] <u>Id.</u> at 925.

12

text, as long as the federal common law rule created is "compatible with ERISA's policies."[19]  In so holding, however, we cautioned that the power of the judiciary "to develop federal common law pursuant to ERISA does not give carte blanche power to rewrite the legislation to satisfy our proclivities."[20]  Thus, federal courts do not have authority under ERISA to create federal common law when that statute "specifically and clearly addresses the issue before th[e] Court."[21]  This is so because, in such instances, the legislative scheme does not contain a "gap" that requires "filling"

---

[19] Jamail, Inc., 954 F.2d at 304; Rodrique v. Western and Southern Life Ins. Co., 948 F.2d 969, 971 (5th Cir. 1991) ("federal courts should create federal common law when adjudicating disputes regarding ERISA") (citing Degan v. Ford Motor Co., 869 F.2d 889, 892 (5th Cir. 1989)); Cefalu v. B.F. Goodrich Co., 871 F.2d 1290, 1297 (5th Cir. 1989) ("federal courts may create federal common law governing employee benefit plans in order to supplement the statutory scheme") (citing Nachwalter v. Christie, 805 F.2d 956, 959 (11th Cir. 1986)); see also United States v. Little Lake Misere Land Co., Inc., 412 U.S. 580, 593 (1973) ("[T]he inevitable incompleteness presented by all legislation means that interstitial federal lawmaking is a basic responsibility of the federal courts."); Morales v. Pan Am. Life Ins. Co., 914 F.2d 83, 87 (5th Cir. 1990) (declining to create federal common law unjust enrichment and third-party beneficiary claims where creation of such claims "would be inconsistent with ERISA's terms and policies").

[20] Jamail, Inc., 954 F.2d at 303.

[21] Cefalu, 871 F.2d at 1297 (refusing to apply federal common law to ERISA "because ERISA specifically and clearly addresse[d] the issue before th[e] Court"); Rodrique, 948 F.2d at 971-72 (refusing to create federal common law rule that would allow employee to assert an estoppel-based argument against the Plan because ERISA "addresses estoppel claims") (citing Degan v. Ford Motor Co., 869 F.2d 889, 895 (5th Cir. 1989) (power to create federal common law when adjudicating ERISA disputes exists only where ERISA preempts but does not address the issue) (citations omitted)).

13

by application of federal common law. Thus, a court's general opinion as to what remedies might further ERISA's underlying policies will not be sufficient "'to overcome the words of its text regarding the _specific_ issue under consideration.'"[22]

Although we have not previously recognized a federal common law right of unjust enrichment or restitution in the context of an ERISA fiduciary's efforts to obtain reimbursement of funds paid to a participant, CBA argues that such a right comports with ERISA's goal of enforcement of plan terms and is necessary to provide CBA with relief in the absence of equivalent statutory or state law remedies.[23] Ogden counters that the Supreme Court, in both _Mertens v. Hewitt Associates_ and _Knudson_, interpreted § 502(a)(3)'s "appropriate equitable relief" language to proscribe precisely the type of monetary relief — or "legal" remedy — that CBA requests. As such, argues Ogden, the district court did not have authority to grant CBA a federal common law right that would, in effect, allow it to circumvent the plain language of ERISA's text, i.e., to do indirectly that which under ERISA it cannot do directly.

As our discussion indicates, CBA's entitlement to a federal common law remedy is dependent on our determining that a gap exists in ERISA's text regarding CBA's right, as a plan fiduciary, to

---

[22] _Knudson_, 534 U.S. at 220 (quoting _Mertens v. Hewitt Assocs._, 508 U.S. 248, 261 (1993)).

[23] CBA did not assert a state law cause of action for breach of contract, and thus we express no opinion as to whether such a claim would be preempted.

14

bring an action for a money judgment enforcing a participant's <u>contractual</u> reimbursement obligation. As we shall show, ERISA's civil enforcement provision specifically and clearly addresses this issue, thereby eschewing any possibility that a "gap" exists in the statutory text that would permit us to employ federal common law to create the remedy that CBA seeks.

To reach that determination, we need only examine the text of § 502(a)(3) in light of the Supreme Court's decisions in Mertens and Knudson. Section 502(a)(3) arms plan fiduciaries with a cause of action "to obtain . . . appropriate equitable relief" to redress any act in violation of ERISA or the terms of the plan or to enforce ERISA's provisions or the terms of the plan.[24] In Mertens, the Supreme Court interpreted § 502(a)(3)'s "appropriate equitable relief" language to include only "those categories of relief that were typically available in equity," reasoning that a contrary interpretation —— namely, one that would allow a plaintiff to bring an action for monetary damages, "the classic form of legal relief," —— "would limit the relief not at all" and "render the modifier [equitable] superfluous."[25] Although the Mertens plaintiffs did not, as CBA does here, ask the Court to recognize a federal common law cause of action in unjust enrichment, the Court, in rejecting their proposed construction of § 502(a)(3), did admonish the

---

[24] 29 U.S.C. § 1132(a)(3).

[25] 508 U.S. at 255-56, 257, 258.

15

plaintiffs that "[t]he authority of courts to develop a 'federal common law' under ERISA is not the authority to revise the text of the statute."[26]

In Knudson, the Supreme Court revisited the boundaries of "equitable relief" under § 502(a)(3) and again carefully emphasized that Congress's use of the word "equitable" was not inadvertent, but rather was a deliberate act on its part to limit a § 502(a)(3) plaintiff's remedies to those that were traditionally considered equitable in nature.[27] For an action to lie in equity, the Court stated, an ERISA plaintiff must "seek not to impose personal liability on the defendant, but to restore to the plaintiff particular funds or property in the defendant's possession."[28] The Knudson Court was singularly unimpressed by the ERISA plan's concerns that limiting § 502(a)(3) actions to include only those remedies "typically available in equity" would deprive the plan of any remedy and create a result contrary to a "'primary purpose of ERISA,' namely, the enforcement of the terms of a plan."[29] To this end, the Court noted that, "'[e]ven assuming ... that petitioners are correct about the pre-emption of previously available

---

[26] Id. at 259 (citing Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 110 (1989)).

[27] 534 U.S. at 220-221. Like CBA, the plan in Knudson sought reimbursement from the beneficiary out of funds that were beyond the beneficiary's possession and control. See id. at 214.

[28] Id. at 214.

[29] Id. at 215, 220.

16

state-court actions' or the lack of other means to obtain relief, 'vague notions of a statute's "basic purpose" are nonetheless inadequate to overcome the words of its text regarding the specific issue under consideration.'"[30]

Looking at ERISA's civil enforcement provision as a whole, the Court in Knudson observed:

> In the very same section of ERISA as § 502(a)(3), Congress authorized 'a participant or beneficiary' to bring a civil action to enforce his rights under the terms of the plan,' without reference to whether the relief sought is legal or equitable. But Congress did not extend the same authorization to fiduciaries. Rather, § 502(a)(3), by its terms, only allows for equitable relief. We will not attempt to adjust the "carefully crafted and detailed enforcement scheme" embodied in the text that Congress has adopted.[31]

As the plan clearly sought to impose personal liability on the beneficiary to enforce her contractual reimbursement obligation under the plan, the Court held that the plan's action was legal in nature and outside the scope of equitable relief permitted by § 502(a)(3).[32]

In the wake of Mertens and Knudson, we have twice interpreted § 502(a)(3) in the context of a plan's suit for reimbursement from a beneficiary. In Bauhaus U.S.A., Inc. v. Copeland, we reversed the district court's exercise of subject matter jurisdiction over the plan's claim, noting that the funds sought by the plan were not

---

[30] Id. at 220 (quoting Mertens, 508 U.S. at 261).

[31] Id. at 220-221 (citations omitted).

[32] See Knudson, 534 U.S. at 221.

17

within the participant's possession and control.[33]   More recently,
in <u>Bombardier Aerospace Employee Welfare Benefits Plan v. Ferrer,
Poirot and Wansbrough</u>, we affirmed the district court's exercise of
subject matter jurisdiction on the basis that the participant had
constructive possession over the funds sought by the plan.[34]   In
each case, we stressed that, for a plan fiduciary's action to fall
within § 502(a)(3)'s jurisdictional grant, it must seek recovery of
(1) specifically identifiable funds, (2) that belong in good
conscience to the Plan, and (3) that are within the possession and
control of the defendant-beneficiary.[35]

As <u>Mertens</u> and <u>Knudson</u> demonstrate, Congress, in drafting §
502(a)(3)(B) to allow only "equitable relief," specifically
contemplated the possibility of extending to plan fiduciaries a
right to sue a participant for money damages and chose instead to
limit fiduciaries' remedies to those typically available in equity.
As ERISA's text "specifically and clearly addresses" the issue

---

[33] 292 F.3d at 445.

[34] <u>See</u> 354 F.3d at 356.

[35] <u>See</u> <u>id.</u>; <u>Bauhaus</u>, 292 F.3d at 444-45.  During oral argument
before the district court, CBA conceded that it had failed to state
a claim for equitable relief under § 502(a)(3) because it had moved
to re-open discovery so that it could "trace the location and
amount of social security disability benefits in the possession,
custody or control of Ogden." <u>Cooperative Benefit Adm'rs, Inc.</u>, 265
F. Supp. 2d 662, 670 (M.D. La. 2003).  We read the district court's
decision to dismiss CBA's § 502(a)(3) claim based on this
concession as an implicit finding on its part that the funds CBA
sought to recover from Ogden were either not specifically
identifiable or beyond her possession and control.

18

whether CBA, as a plan fiduciary, has a right to pursue a claim for legal relief against Ogden, there is no "gap" in ERISA on this question and thus no basis for granting CBA a federal common law remedy. We therefore cannot sanction the district court's decision to grant CBA a federal common law right to pursue its claim for money damages against Ogden.

CBA nevertheless argues that <u>Knudson</u>'s statement that "there may have been other means for petitioners to obtain the essentially legal relief that they seek" can be construed as either an endorsement of a federal common law remedy or at least an intimation that its holding did not foreclose the possibility that a federal common law remedy might exist.[36] We are unpersuaded. Aside from obviously being dicta, this statement was made only to highlight the Court's point, discussed above, that the availability <u>vel</u> <u>non</u> of other remedies to the plan was irrelevant to the Court's decision to deny the plan's claim for legal relief because that type of relief was expressly proscribed by ERISA's text.[37] Thus, we do not read this statement as an invitation to the lower courts

---

[36] <u>Knudson</u>, 534 U.S. at 220.

[37] The Court went on to state that it "express[ed] no opinion as to whether [the plan] could have intervened in the state-court tort action brought by respondents or whether a direct action by petitioners against respondents asserting state-law claims such as breach of contract would have been pre-empted by ERISA . . . . [or] whether [the plan] could have obtained equitable relief against respondents' attorney and the trustee of the Special Needs Trust." <u>Id.</u>

19

to grant plan fiduciaries a federal common law right to pursue claims for legal remedies against participants.

We are equally unconvinced by CBA's suggestion that Mertens and Knudson are somehow inapposite because the plaintiffs in those cases did not seek a federal common law remedy. To reach the decision we make today, we need only determine that ERISA's text specifically and clearly addresses the question whether CBA, as a plan fiduciary, has a right to pursue a claim for legal relief against Ogden. Mertens and Knudson explain in great detail that Congress not only considered this precise question in enacting § 502(a)(3), but answered it in the negative. Far from being inapposite, then, these opinions are directly controlling of our decision not to extend to CBA a federal common law right to pursue its reimbursement claim against Ogden.

We also reject CBA's attempt to analogize its case to our precedent in Jamail v. Carpenters District Council of Houston Pension & Welfare Trusts.[38] Decided prior to Mertens and Knudson, Jamail recognized the existence of an employer's federal common law right to recover contribution "overpayments" mistakenly made to its ERISA plan.[39] Noting that ERISA § 1132 provides a private right of action for fiduciaries, participants, and beneficiaries, but not for employers, we reasoned in Jamail that a "gap" existed in

---

[38] 954 F.2d 299 (5th Cir. 1992).

[39] See id. at 305.

20

ERISA's text regarding an employer's rights to recover overpayment of contributions from the plan to which such overpayments had been made.[40] Thus, we held that recognition of a federal common law right of restitution for an employer vis-à-vis a plan was appropriate, as ERISA's text did not address the issue, and such a right would further ERISA's underlying purposes by encouraging small employers to sponsor benefit plans for their employees.[41]

Although CBA styles its reimbursement action as one for "overpayment of benefits," Jamail is clearly distinguishable, based on the obvious difference between an employer qua employer and a traditional ERISA party, i.e., plans, fiduciaries, participants, and beneficiaries. In Jamail, we were faced with an actual gap in ERISA's text which makes no mention of employers. We could not, therefore, point to precise language in ERISA's text demonstrating that, either expressly or implicitly, Congress had proscribed the kind of relief that the employer plaintiff sought. As ERISA's text did not specifically and clearly address whether an employer had a right to recoup mistakenly paid contributions from the plan, and as creation of such a remedy was compatible with the policies of ERISA, the Jamail panel did not have to "rewrite" ERISA to grant the employer a federal common law right of restitution against the plan. Jamail thus has no bearing on our refusal today to create a

---

[40] See id. at 303-04.

[41] See id.

federal common law right of unjust enrichment that would allow a plan fiduciary to assert an action for legal relief against a participant, both parties being members of categories expressly identified in § 502.

We acknowledge that, in holding as we do, we may appear to be at variance with the Fourth Circuit's pre-Mertens decision in Provident Life & Accident Insurance Company v. Waller.[42] In Waller, the Fourth Circuit recognized the existence of a federal common law right of restitution on the part of a plan fiduciary to recover benefits from a beneficiary.[43] The facts of that case are as follows: The Plan administrator sought reimbursement of benefits paid to the beneficiary after settlement funds from a third party tortfeasor were received on behalf of the beneficiary.[44] The Plan administrator did not, however, allege jurisdiction under § 502(a)(3), but rather under § 502(a)(2)(B), which provides a civil action only to participants and beneficiaries to recover benefits owed from a plan.[45] Noting that § 502(a)(2)(B) does not authorize the converse, i.e., suits by plan administrators to recover from participants or beneficiaries, the Fourth Circuit held that the provision in question did not provide a basis for jurisdiction and

---

[42] 906 F.2d 985 (4th Cir. 1990).

[43] See id. at 993.

[44] See id. at 986–87.

[45] See id.; 29 U.S.C. § 1132(a)(1).

22

went on to create a federal common law right of restitution for the plan administrator.[46]

A close reading of Waller's analysis, however, reveals that the reasoning and facts of that case constitute an inadequate basis for our recognition of a federal common law right of unjust enrichment in the instant case. Although the Fourth Circuit noted that "it [was] probable" that the plan administrator had stated a cause of action for equitable relief under § 502(a)(3), it declined to decide the issue, as the plan administrator had not advanced § 502(a)(3) as the basis for jurisdiction and "as there [was] seemingly little or no authority" on what was required to state an action for equitable relief under § 502(a)(3).[47] Thus, the Waller court recognized a federal common law right of restitution on the part of a plan administrator against a beneficiary without ever considering the applicability of § 502(a)(3) to the administrator's requested relief.

Even so, CBA urges us to follow Waller in granting it a federal common law right of restitution against Ogden, pointing out that the Fourth Circuit recently upheld Waller's holding in a post-Knudson decision, Rego v. Westvaco Corporation.[48] In Rego, the Fourth Circuit declined to grant a beneficiary a federal common law

---

[46] See Waller, 906 F.2d at 987, 991.

[47] See id. at 988 n.6

[48] 319 F.3d 140, 149 (4th Cir. 2003).

23

right to sue the plan for breach of fiduciary duty and negligent misrepresentation.[49] In reaching its decision, the court reasoned that, because "Congress clearly contemplated plaintiffs like [the beneficiary] and explicitly created remedies for them within the text of the statute itself,"[50] the court could not "disregard Congress' decision to limit the scope of those remedies."[51] The Fourth Circuit went on, however, to distinguish its holding in Rego from its decision to create a federal common law remedy in Waller on the basis that, in Waller, "'ERISA [did] not provide an explicit remedy'" for the administrator.[52]

We find questionable the Rego court's efforts to distinguish Waller, in that the reasoning in the later case fails to account for the fact that Waller had not considered the applicability of § 502(a)(3) to the plan administrator's claim prior to granting the administrator a federal common law remedy. We therefore decline to adopt the Fourth Circuit's reasoning in Waller, as approved by Rego, because in neither case was the Court in a position to decide whether a "gap" existed in ERISA's text that would allow for the application of federal common law. Accordingly, CBA's reliance on

---

[49] See id.

[50] Id.

[51] Id.

[52] Id. (quoting Waller, 906 F.2d at 990).

*Waller*, although somewhat understandable in light of *Rego*, is nevertheless misplaced.

Our decision not to follow *Waller*'s holding is equally unaffected by *Jamail*'s suggestion that *Waller* was correctly decided.[53] A close look at *Jamail*'s discussion of *Waller* reveals that its approval was based on a pre-*Mertens* understanding of what constitutes "equitable" relief under § 502(a)(3).[54] Specifically, we noted in *Jamail* that "restitution is a cause of action with its origins in equity" and cited *Waller* as an example of a case in which equity had been achieved in aid of the plan by the court's recognition of a federal common law right of restitution on the part of the plan.[55] With the hindsight benefit of *Mertens* and *Knudson*, however, we now know that "not all relief falling under the rubric of restitution is available in equity," and that restitution can be either a legal or equitable remedy, depending on the "'basis for [the plaintiff's] claim' and the nature of the underlying remedies sought."[56] In *Jamail*, we could not have known whether the reimbursement action brought by the plan in *Waller* was legal or equitable in nature, or whether the *Waller* court was

---

[53] See *Jamail, Inc.*, 954 F.2d at 305.

[54] See *id.* (describing *Waller* as "a case in which equitable principles were applied to the pension plan's benefit") (citing *Waller*, 906 F.2d at 990).

[55] *Id.*

[56] *Knudson*, 534 U.S. at 212-13 (quoting *Reich v. Continental Casualty Co.*, 33 F.3d 754, 756 (7th Cir. 1994)).

"achieving equity" in allowing the plan a federal common law right of restitution. This is because the <u>Waller</u> court did not consider the issue or otherwise analyze whether the plan had stated a cause of action for equitable relief under § 502(a)(3). The <u>Jamail</u> panel's misconception of the nature of equitable relief becomes even more apparent when we observe that, if the <u>Waller</u> plaintiff's restitution action were truly equitable in nature, as the <u>Jamail</u> panel assumed, there would have been no need for the <u>Waller</u> court to create a federal common law remedy to "achiev[e] equity" because the plan's action would have been authorized under § 502(a)(3). Thus, <u>Jamail</u>'s discussion of <u>Waller</u> does not affect our decision today to reject <u>Waller</u>'s holding.

To summarize, the district court erred in recognizing a federal common law right of unjust enrichment on CBA's behalf. As the text of § 502(a)(3) and Supreme Court precedent make clear, Congress, in choosing the modifier "equitable," specifically contemplated and chose to proscribe the legal remedy that CBA proffers. As ERISA's text specifically and clearly addresses the issue now before us, there is no "gap" in that text that would warrant our application of federal common law. We thus hold that ERISA plan fiduciaries do not have a federal common law right to sue a beneficiary for legal (as distinct from equitable) relief on a theory of unjust enrichment or restitution. Concluding that CBA failed to state a cause of action under the federal common law

26

applicable to ERISA, we reverse the district court's denial of Ogden's motion to dismiss this claim.[57]

## C. Ogden's Counterclaim for Benefits[58]

The district court held that Ogden's counterclaim for benefits from May 2000 to date was barred for failure to exhaust administrative remedies; specifically, for not complying with the Plan's claim-review procedures.[59] We have held that "claimants seeking benefits from an ERISA plan must first exhaust available administrative remedies under the plan before bringing suit to recover benefits."[60] Here, the Plan's documents require a participant to file an administrative appeal of the denial of a claim for benefits within 90 days after being notified that the

---

[57] Jurisdiction over Ogden's counterclaim is premised on § 1132(a)(1) which allows a participant to bring a civil action "to recover benefits due to him under the terms of his plan." 29 U.S.C. 1132(a)(1)(B).

[58] Ogden also moved for partial summary judgment in the district court on her affirmative defense that CBA was not entitled to offset her plan benefits by the amount of her monthly retirement pension because, under the terms of the Plan, retirement pension benefits could only be offset "to the extent [they were] paid to the Participant," and Ogden had in fact withdrawn the funds from her pension and rolled them into an IRA. The district court rejected this argument on the basis that Ogden had not followed the Plan's claim review procedure in challenging CBA's decision to offset her pension benefits. We do not address this issue as Ogden has not briefed it on appeal.

[59] See Cooperative Benefit Adm'rs, Inc., 265 F. Supp. 2d at 681.

[60] Bourgeois v. Pension Plan for the Employees of Santa Fe Int'l Corps., 215 F.3d 475, 479 (5th Cir. 2000) (citing Denton v. First Nat'l Bank of Waco, 765 F.2d 1295, 1300 (5th Cir. 1985)).

claim has been denied. In the district court, Ogden argued that any attempt to exhaust her administrative remedies would have been futile, but she has not advanced this limited exception to the exhaustion requirement on appeal.[61] Neither has she challenged the district court's finding that she failed to comply with the Plan's claim review procedures. Instead, Ogden merely asserts that, in the event we hold that she is not contractually liable under the Reimbursement Agreement for the Social Security benefits received by her adult daughters — an issue that we do not reach as a result of our finding that CBA failed to state a federal common law cause of action — then she is entitled to recover the amount of her plan benefits that CBA suspended through exercise of its setoff rights. As Ogden has not shown on appeal that she exhausted her administrative remedies, or that her efforts to exhaust would have been futile, we must affirm the district court's conclusion that her counterclaim is barred for failure to exhaust, and thus we affirm the court's grant of summary judgment dismissing her counterclaim.

## III. CONCLUSION

Concluding that CBA has failed to state an ERISA cause of action under federal common law, we reverse the district court's denial of Ogden's motion to dismiss CBA's claim, grounded in

---

[61] We have "recognized an exception to the affirmative defense of failure to exhaust administrative remedies when such attempts would be futile." Id. (citing Hall v. Nat'l Gypsum Co., 105 F.3d 225, 232 (5th Cir. 1997)).

federal common law, but do so for failure to state a claim, not for lack of subject matter jurisdiction, and we render a judgment dismissing that claim; however, we affirm the district court's grant of summary judgment dismissing Ogden's counterclaim for benefits because she failed to exhaust administrative remedies. REVERSED and RENDERED in part; AFFIRMED in part.