**David MURRAY, Plaintiff,**

**v.**

**HARTFORD LIFE & ACCIDENT INSURANCE COMPANY, Defendant.**

**Case No. 6:08–cv–150–Orl–22KRS.**

United States District Court, M.D. Florida, Orlando Division.

June 11, 2009.

William S. Coffman, Jr., Coffman Law, Tampa, FL, for Plaintiff.

Jerel C. Dawson, William J. Gallwey, III, Shutts & Bowen, LLP, Miami, FL, for Defendant.

#### ORDER

ANNE C. CONWAY, District Judge.

This cause comes before the Court for consideration of Defendant Hartford Life & Accident Insurance Company's ("Hartford Life") Dispositive Motion for Summary Judgment (Doc. No. 19), filed on January 9, 2009. Plaintiff David Murray ("Murray") filed a response in opposition (Doc. No. 21) to Hartford Life's Motion for Summary Judgment on January 22, 2009. Hartford Life filed a reply in support of its motion for summary judgment (Doc. No. 24) on March 2, 2009.[1] Based on the parties' submissions and a review of the administrative record and relevant case law, the Court concludes that Hartford Life is entitled to judgment as a matter of law on Murray's claims.

### I. BACKGROUND

Murray was employed at Publix Super Markets, Inc. ("Publix") as an assistant store manager. (Doc. No. 20 Ex. 3 p. 56.) According to Publix's job description, an assistant store manager's main function is to "assist in leading the management team in operating a quality store" and to be "[r]esponsible for [the] total store in the absence of the Store Manager." (*Id.* at 58.) Murray's duties included the following:

---

**1.** The Court granted Hartford Life leave to file a reply on February 21, 2009. (Doc. No 23.)

1. working with the store manager and department managers to improve operations;

2. assisting in setting goals, developing plans, overseeing inventory control and merchandising of product;

3. ensuring all associates are treated with dignity and respect;

4. supervising and assisting in evaluation and training of associates and participating in hiring and disciplinary actions when appropriate;

5. assisting in projecting sales and controlling costs;

6. reinforcing all company policies, and all local, state and federal regulations;

7. reinforcing sanitation, security and safety guidelines;

8. utilizing excellent interpersonal skills;

9. maintaining good public relations, including following up on customer and associate issues;

10. assisting in monitoring competition;

11. assisting customers; and

12. completing other duties as may arise.

(*Id.*) As to "Working Conditions," the Publix job description stated:

An Assistant Store Manager's duties are performed primarily throughout the store and involve accepting responsibility for leading others. An Assistant Store Manager may be exposed to various temperature changes, work environments and types of tasks performed. Work includes frequent walking, standing and interaction with customers, associates, district staff and vendors.

(*Id.* at 59.) Murray participated in Publix's employee welfare benefit plan and was issued a long-term disability ("LTD") policy (the "Policy"). (Doc. No. 1 ¶ 6.)

LTD benefits were payable to a participant who became totally disabled, as defined in the Policy, and remained continuously totally disabled through and beyond the Policy's elimination period (the "Elimination Period"). (Doc. 1 Ex. A p. 18, 25.) The Policy defined "totally disabled" as follows:

**Totally Disabled** means that:

(1) during the Elimination Period; and

(2) for the next 24 months, you are prevented by Disability from doing all the material and substantial duties of your own occupation on a full-time basis.

After that, and for as long as you remain Totally Disabled, you are prevented by Disability from doing any occupation or work for which you are, or could become, qualified by:

(1) training;

(2) education; or

(3) experience.

(*Id.* at 25.) The Policy defined the Elimination Period as follows:

**Elimination Period** means the period of time you must be Totally Disabled before benefits become payable. The Elimination Period for this Plan is the first 90 days of any one period of Total Disability. If you cease to be Totally Disabled and return to work for a total of 14 days or less during an Elimination Period, the Elimination Period will not be interrupted or extended.

Except for the 14 days or less you work, you must be Totally Disabled by the same condition for the total Elimination Period.

(*Id.* at 18.) Thus, for the Elimination Period and the following twenty-four months, the question is whether a claimant is disabled from performing the material and substantial duties of his own occupation on a full-time basis. After twenty-four months of benefits, the question is whether

a claimant is disabled from performing the duties of any occupation for which the claimant is, or could become, qualified by training, education, or experience.

On December 26, 2006, Murray fell from a four foot stepladder while changing a light bulb in his kitchen, landing on his heels. (Doc. No. 20 Ex. 3 p. 100.) He was barefoot at the time. (*Id.*) Immediately after the accident, he was seen at Winter Park Memorial Hospital's emergency room for back and bilateral heel pain. (*Id.*; Doc. No. 20 Ex. 4 pp. 3, 52.) On December 28, 2006, Murray, using crutches, was seen at the Jewett Orthopaedic Clinic ("Jewett Clinic") in Winter Park, Florida. (Doc. No. 20 Ex. 4 p. 3.) Hugo Quevedo, PA–C [2] ("Quevedo") examined Murray and reported that Murray rated his pain as 5 out of 10 and worse with motion. (*Id.*) Quevedo further noted that Murray stated he was having increased difficulty ambulating and was unable to put any pressure on his heels. (*Id.*) Additionally, Quevedo stated that Murray will "remain off work for the next 4 weeks." (*Id.* at 1.) The diagnostic impression of the right knee revealed an incidental finding of patellofemoral arthritis. (*Id.* at 2.) No fractures, dislocations, or obvious subluxations were found in the left knee. (*Id.*) The diagnostic impression of the left foot revealed "what appear[ed] to be a fracture of the neck of the calcaneus, with an undetermined fracture of the calcaneal spur." (*Id.* at 1–2.) "Radiographs of the right foot reveal[ed] what appear[ed] to be an acute fracture of the calcaneal spur." (*Id.* at 1.)

On December 29, 2006, Ivan Repass, PA–C ("Repass") examined Murray at the Jewett Clinic in connection with mid-thoracic back pain. (Doc. No. 20 Ex. 3 p. 100.) Repass noted that Murray's "pain is somewhat improved, and now is pretty much a dull pain. When he rotates at the waist, he has the acute onset of sharp pain. He has pain if he lies flat on his back." (*Id.*) Murray described the pain as "sharp and aching and is 1 out of 10 on the pain scale...." (*Id.*) A CT of the thoracic spine revealed an anterior wedge fracture of the T6 vertebra. (*Id.* at 97, 99.)

On January 5, 2007, Repass saw Murray at the Jewett Clinic to "followup on his condition" and undergo a CT scan. (*Id.* at 97.) Repass noted that Murray "continues to have severe back pain" and that his "condition is unchanged since last visit." (*Id.*) Repass further noted that Murray "has a cast on his left foot, and continues to use crutches." (*Id.*) According to Repass, the fracture "appears stable" but "it may take a couple of months for this to improve," and Murray could use "pain medicine as needed." (*Id.*) [3]

On February 1, 2007, Quevedo saw Murray at the Jewett Clinic. (*Id.* at 95.) Quevedo reported that the right spur fracture was "healing very nicely" and the left knee contusion was "resolved." (*Id.*) Quevedo stated that Murray would need "continued immobilization to the left calcanues" and prescribed a foam walker instead of the cast, which he was "not tolerating." (*Id.* at 94.) Quevedo recommended that Murray "remain off work for an additional 4 weeks, as his job primarily entails walking or standing anywhere from 10 to 12 hours per day...." (*Id.*)

On February 26, 2007, Murray was again examined by Quevedo at the Jewett Clinic. (*Id.* at 93.) Murray stated that he

---

**2.** PA–C stands for "Physician Assistant—Certified."

**3.** In a letter dated April 10, 2007, Dr. Kenneth A. Krumins, MD ("Dr. Krumins"), stated that Murray visited Jewett Clinic on January 4, 2007. (Doc. No. 20 Ex. 3 p. 77.) The Court notes that this date conflicts with the date of Repass' report. The report indicates that Murray saw Repass at the Jewett Clinic on January 5, 2007. (*See id.*)

"is having no pain to the left knee and right foot calcaneus spur fracture" but has "minimal discomfort on the left calcaneal fracture region." (*Id.*) Quevedo noted that "on examination …, there is a trace or soreness upon palpation, but no true pain. He has normal ambulation. He can heel walk and toe walk without pain or discomfort." (*Id.*) The treatment report provided the following impression of Murray's status:

IMPRESSION:

1. 48–year–old gentleman who is nine weeks status post left calcaneus fracture, mild to moderate comminution, nondisplaced, treated with a short leg cast and pneumatic foam walker with excellent healing.

2. Right foot calcaneal spur fracture, healed.

3. Left knee contusion, resolved.

(*Id.*) Murray was advised to initiate light duty status, working six hours per day, five days per week and to return to the Jewett Clinic for a follow-up in two weeks. (*Id.*) Quevedo recommended that "if everything goes according to plan [Murray] will initiate full duty status without restrictions." (*Id.* at 92.) Dr. Krumins signed off on the report, indicating that he had reviewed Murray's chart. (*Id.*)

Murray returned to work for part of March 2007, working on March 3, March 5, March 6–12, and March 27–28, for a total of eleven days. (Doc. No. 20 Ex. 4 p. 328.)

On March 12, 2007, Quevedo saw Murray at the Jewett Clinic. (Doc. No. 20 Ex. 3 p. 91.) Murray indicated that "he is doing very well, having no difficulty [whatsoever]" and "performing full duties at work." (*Id.*) Physical examination revealed no tenderness to the right knee and Murray exhibited a "normal gait." (*Id.*)

Murray was seen again at the Jewett Clinic on March 27, 2007, "to followup on his condition because he continues to have pain." (*Id.* at 89.) Murray reported that

two nights ago, while in bed, he sneezed and had significant thoracic discomfort. (*Id.*) Murray further stated that he was having difficulty completing his shift at Publix because his has to stand for many hours. (*Id.*) A repeat x-ray did not indicate any worsening of Murray's condition. (*Id.*) Repass noted that "[i]t appears as though his fracture is stable. I cannot detect worsening of the compression fracture." (*Id.*) Repass gave Murray a note recommending that Murray should be on limited duty, avoid standing as much as possible, and should not lift more than five pounds. (*Id.* at 88.) Repass also stated in his treatment report that he would refer Murray to Dr. Mark Beckner, M.D. ("Dr. Beckner") for evaluation. (*Id.*)

On March 29, 2007, Dr. Beckner examined Murray at the Jewett Clinic. (*Id.* at 87.) Dr. Beckner noted that Murray's foot fractures had healed and the "main thing that bothers him is his upper back." (*Id.*) Murray told Dr. Beckner that "[h]e has not been able to return to work full time as a manager at Publix because of the continued pain when he is up all day." (*Id.*) Murray was taking "some Naprosyn" and an "occasional Darvocet" for pain. (*Id.*) Reviewing Murray's x-rays, Dr. Beckner observed: "These show he has a minimal compression deformity of T6, maybe 10 to 20% originally. At most, it is 20% now. Alignment appears good. There are no signs of any destructive element in the bone." (*Id.* at 86.)

On April 9, 2007, Dr. Beckner saw Murray again. (*Id.* at 85.) In the treatment note, Dr. Beckner commented that a recent spine MRI showed "interesting findings," with subacute changes at T7 and T10 indicating possible additional fractures in those vertebrae. (*Id.*) Dr. Beckner reported that Murray "states he is still hurting as such that he does not feel like he can return to work." (*Id.* at 84.) Dr.

Beckner opined, "Based on [Murray's] x-rays and MRI findings, I would suspect that his spine is quite stable...." (*Id.*)

In his April 10, 2007 letter, Dr. Krumins indicated that as of March 12, 2007, Murray was released to "full duties at work." (*Id.* at 77.)

On April 15, 2007, Murray applied for LTD benefits from Hartford Life, stating that he had been unable to work since December 26, 2006. (Doc. No. 20 Ex. 4 pp. 51–54.) Murray attached an Attending Physician's Statement ("APS") to his LTD claim. (*Id.* at 43.) Dr. Beckner completed the APS on April 19, 2007. (*Id.*) Dr. Beckner's primary diagnosis was "fracture pathological vert[ebra]." (*Id.*) Dr. Beckner noted that physical examinations revealed "a little bit of discomfort in the interscapular region somewhat below T6." (*Id.*) Dr. Beckner further noted that Murray could stand and walk "as tolerated" because Murray "reports increased pain when up for prolonged periods." (*Id.* at 42.) Dr. Beckner also indicated that Murray could lift, push, or pull fifteen pounds. (*Id.*) Finally, Dr. Beckner noted that Murray became unable to work due to this impairment on April 9, 2007. (*Id.*)

On April 26, 2007, Murray returned to the Jewett Clinic, complaining of increased back pain. (Doc. No. 20 Ex. 3 p. 83.) He was examined by Dr. Beckner, whose report stated, "At this point, I still cannot fully explain the level of pain he is having this far down the line from what appeared to be fairly minimal fractures." (*Id.*)

After seeing Murray on May 10, 2007, Dr. Beckner stated:

> It has been 4–½ months since his fracture. I am assuming this is just a slow healing fracture. It should steadily improve. I will see him with x-rays at 6 months. We will possibly try therapy again at that time if he is still having problems. He can do light duty work, but he states this is not available for him.

(*Id.* at 82.)

As part of the benefits determination, Hartford Life interviewed Murray by telephone on May 10, 2007. Murray indicated that he was not sure when he will be able to return to work based on the fact that his job required prolonged and sustained walking and heavy lifting. (*Id.* at 4.) He noted that his job requires fifty to sixty hours per week and for forty of those hours he is constantly on his feet. (*Id.*)

On May 21, 2007, Dr. Beckner completed a Physical Capacities Evaluation ("PCE") form, stating that Murray was capable of sitting, standing, or walking for eight hours at a time, and lifting up to twenty pounds on an occasional basis. (*Id.* at 80–81.)

On May 23, 2007, Repass completed an APS. (*Id.* at 75.) Noting that he had last seen Murray on March 27, 2007, Repass stated that Murray's ability to sit, stand, walk and drive as of that date was "limited to tolerance of pain." (*Id.* at 76.) Repass further stated that Murray could do no lifting, pushing, pulling or reaching overhead. (*Id.*)

On June 4, 2007, Dr. Krumins completed another APS, indicating that as of March 12, 2007, Murray had no restrictions or limitations from his heels or knee, and that Murray had been "released to work full duty." (*Id.* at 78–79.) Dr. Krumins also indicated his progress status as "recovered." (*Id.* at 78.)

Hartford Life's reports indicate that it performed an occupational analysis on June 29, 2007, to determine the physical requirements of Murray's occupation at Publix as Assistant Manager. (Doc. No. 20 Ex. 2 p. 95.) The analysis determined that Murray's position most closely matches the Dictionary of Occupational Ti-

tles' ("DOT") position of "Manager, Retail Store." (*Id.*) Under the DOT, the position of "Manager, Retail Store" is one of "light physical exertion." The DOT describes the strength demands of "light work" to include:

> Exerting up to 20 pounds of force occasionally, and/or a negligible amount of force constantly ... to move objects. Physical demand requirements are in excess of those for Sedentary Work. Even though the weight lifted may be only a negligible amount, a job should be rated light work (1) when it requires walking or standing to a significant degree; or (2) when it requires sitting most of the time but entails pushing and/or pulling of arm or leg controls; and/or (3) when the job requires working at a production rate pace entailing the constant pushing and/or pulling of materials even though the weight of those materials is negligible.

DOT at Appendix C, Part IV(c).

On July 3, 2007, Hartford Life notified Murray of its decision to deny his claim on the ground that the evidence did not substantiate a disability through and beyond the Elimination Period. (Doc. No. 20 Ex. 2 pp. 82–85.)

On August 27, 2007, Hartford Life received a letter from Murray, appealing the decision to deny his claim. (*Id.* at 93–94; Doc. No. 20 Ex. 3 p. 41.) Enclosed with the appeal letter was a letter from Dr. Beckner, dated July 26, 2007. Dr. Beckner's letter stated:

> Mr. David Murray has been under my treatment for a compression fracture of his thoracic spine. The symptoms of this have been unusually persistent and have made him unable to perform his job, which requires pushing, pulling, lifting, and standing for 8–10 hours a day.

(Doc. No. 20 Ex. 3 p. 42.) Also enclosed with the appeal letter were a return-to-work slip signed by Repass on March 27, 2007, indicating that Murray could not return to work on that date, and another slip signed by Repass on March 29, 2007, indicating that Murray could not return to work until further notice. (*Id.* at 43–44.)

On September 25, 2007, Hartford Life received an APS from Richard Konsens, M.D. ("Dr. Konsens"), of the Jewett Clinic. The APS, signed by Dr. Konsens on September 14, 2007, indicated that: (a) Murray's primary diagnosis was osteoarthritis of the right knee, for which Murray began receiving treatment on May 9, 2007; (b) Murray became unable to work due to his knee condition on May 9, 2007; (c) Murray was scheduled for a right total knee replacement surgery on September 17, 2007; and (d) Murray was limited to standing for a maximum of one hour, walking for a maximum of hour, and lifting 10 pounds. (*Id.* at 33–34.)

As part of its evaluation of Murray's appeal, Hartford Life submitted Murray's LTD claim for an independent peer review by an orthopedic surgeon, William Andrews, M.D. ("Dr. Andrews"). Dr. Andrews opined that Murray would have been able to perform "light duty in accordance with DOT physical demand levels" on a full-time basis as of February 26, 2007, and continuing "until his surgery" on September 17, 2007. (*Id.* at 19.) Dr. Andrews' report concluded as follows:

> Mr. Murray sustained significant injuries from his fall on 12/26/2006. Both heel fractures and the T6 compression fractures have healed well. He developed increasing pain in the left knee and has recently undergone a total knee replacement. As he is currently freshly post-op, he cannot work currently, but as of 2/26/2007 until the surgery, he would have been safely able to work in a light duty capacity. By 11/01/2007, he could return in a sedentary capacity.

His heel fractures and thoracic spine fractures are well healed and stable.

(*Id.* at 20.)

On October 31, 2007, Hartford Life notified Murray in writing of its decision to uphold its prior decision denying Murray's claim for LTD benefits because Hartford Life determined that Murray was able to perform the essential duties of his occupation prior to the end of the Elimination Period. (Doc. No. 20 Ex. 2 p. 75.) Thus, according to Hartford Life, since Murray did not meet the definition of disability throughout and beyond the Elimination Period, the Policy dictated that coverage terminated in March 2007 and any change in Murray's condition after the end of the Elimination Period could not be considered. (*Id.*)

## II. STANDARD OF REVIEW

Since the text of ERISA itself does not set forth a standard for district courts to apply in reviewing an administrator's denial of benefits, the district court examines the plan documents to determine the applicable standard of review. *See Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 109, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989). To apply the Supreme Court's holding in Firestone, the Eleventh Circuit has outlined a six-step test that a district court must follow whenever it reviews an administrator's decision:

(1) Apply the de novo standard to determine whether the claim administrator's benefits-denial decision is "wrong" (i.e., the court disagrees with the administrator's decision); if it is not, then end the inquiry and affirm the decision.

(2) If the administrator's decision in fact is "de novo wrong," then determine whether he was vested with discretion in reviewing claims; if not, end judicial inquiry and reverse the decision.

(3) If the administrator's decision is "de novo wrong" and he was vested with discretion in reviewing claims, then determine whether "reasonable" grounds supported it (hence, review his decision under the more deferential arbitrary and capricious standard).

(4) If no reasonable grounds exist, then end the inquiry and reverse the administrator's decision; if reasonable grounds do exist, then determine if he operated under a conflict of interest.

(5) If there is no conflict, then end the inquiry and affirm the decision.

(6) If there is a conflict of interest, then apply heightened arbitrary and capricious review to the decision to affirm or deny it.

*Doyle v. Liberty Life Assurance Co. of Boston*, 542 F.3d 1352, 1358–57 (11th Cir. 2008) (citing *Williams v. BellSouth Telecomms., Inc.*, 373 F.3d 1132, 1138 (11th Cir.2004)).

As to the sixth step in this analysis, however, the Eleventh Circuit recently eliminated the heightened standard of review applicable when a conflict of interest is present. *Doyle*, 542 F.3d at 1360.[4] In *Doyle*, the Eleventh Circuit overruled its precedent to "the extent it requires district courts to review benefit determinations by a conflicted administrator under the heightened standard." *Id.* The court held that "the existence of a conflict of interest should merely be a factor for the district court to take into account when determining whether an administrator's decision was arbitrary and capricious." *Id.*

---

4. Specifically, the Eleventh Circuit held that the Supreme Court in *Metropolitan Life Insurance Co. v. Glenn*, —— U.S. ——, 128 S.Ct. 2343, 171 L.Ed.2d 299 (2008), "implicitly overrules our precedent to the extent it re-quires district courts to review benefit determinations by a conflicted administrator under the heightened standard." *Doyle*, 542 F.3d at 1360.

The Court further held that, "while the reviewing court must take into account an administrative conflict when determining whether an administrator's decision was arbitrary and capricious, the burden remains on the plaintiff to show the decision was arbitrary; it is not the defendant's burden to prove its decision was not tainted by self-interest." *Id.*

This case falls under the category of ERISA cases involving a conflict of interest because Hartford Life, as the administrator of the plan, also acts as a fiduciary and makes discretionary decisions, all while serving as the insurance company paying the claims out of its own assets. *See Glenn,* 128 S.Ct. 2343 (holding that where plan administrator is not the employer but is itself a professional insurance company, a conflict exists). Thus, pursuant to *Glenn* and *Doyle,* this Court should consider Hartford Life's conflict when determining whether Hartford Life's decision was arbitrary and capricious.

Though this case comes before the Court on a motion for summary judgment, the summary judgment standard set forth in Fed.R.Civ.P. 56 is incongruent with the ERISA standard of review. *Compare* Fed.R.Civ.P. 56(c) and *Williams,* 373 F.3d at 1138; *see also Leahy v. Raytheon Co.,* 315 F.3d 11, 17 (1st Cir.2002). The Eleventh Circuit charges the district court with determining de novo whether the administrator's decision was wrong, *Williams,* 373 F.3d at 1138, rather than whether there are questions of material fact that require trial and whether the parties are entitled to judgment as a matter of law. *See* Fed. R.Civ.P. 56(c). There may indeed be unresolved factual issues evident in the administrative record, but unless the administrator's decision was wrong, these issues will not preclude summary judgment as they normally would. *See Leahy,* 315 F.3d at 17; *see also* this Court's decision in *Crume v. Metro. Life Ins. Co.,* 417 F.Supp.2d 1258, 1272–73 (M.D.Fla.2006) (in-depth discussion of interplay between ERISA and summary judgment standards as applied by courts in the Middle District of Florida and elsewhere).

## III.  ANALYSIS

### A.  Step One: Was Hartford Life's Decision Wrong?

■  Simply put, Hartford Life is entitled to summary judgment at the first analytical step. Based on the facts and the language of the Policy, the Court finds that both Hartford Life's initial decision to deny Murray's claim for LTD benefits and its decision on appeal to reaffirm the denial were not de novo "wrong;" and even if they were wrong, they were reasonable.

As stated above, the Policy defines "totally disabled" as being prevented "from doing all the material and substantial duties of your *own occupation* on a full-time basis." (Doc. No. 1 Ex. A p. 25) (emphasis added). The parties disagree over the meaning of "own occupation," a term the Policy fails to define. Murray argues that the term "occupation" should refer to his specific job-a position which he contends requires heavy lifting, and a great deal of standing and walking for up to fifty to sixty hours per week. (*Id.* at 10, 13.) In response, Hartford Life contends that when the term "occupation" is left undefined in an ERISA-governed disability policy, courts properly defer to the DOT's definition of the term. (Doc. No. 19 p. 14.) Hartford Life further asserts that neither the DOT nor the Publix job description include heavy lifting as a requirement of Murray's job. (*Id.* at 16–18.) Thus, Hartford Life argues that it was not wrong in classifying Murray's occupation as a retail store manager and assessing the functional demands of that job as light work. (*Id.* at 17.)

As other judges in this district have aptly noted, "own occupation" when not defined in the plan documents means the occupation "as it is generally performed in the labor market." *Clark v. Hartford Life & Accident Ins. Co.*, No. 8:05–cv–67–T–23MAP, 2006 WL 890660, at * 4 (M.D.Fla. Apr. 6, 2006) (finding that the occupation of Publix store manager belongs in the DOT category of "retail store manager," which the DOT classifies as "light work"). Accordingly, the Court finds that Hartford Life was not wrong in classifying Murray's position according to the DOT's description of retail store manager and assessing the functional demands of his job as "light work."

The administrative record establishes that Murray was capable of "light work" during the Elimination Period. Notably, on February 26, 2007, just two months after the accident, Dr. Krumins recommended that Murray initiate light duty status, working six hours per day, five days per week. (Doc. No. 20 Ex. 3 p. 93.) Murray returned to work for part of March 2007, working a total of eleven days. (Doc. No. 20 Ex. 4 p. 328.) On March 12, 2007, Murray indicated that he was "doing very well, having no difficulty [whatsoever]" and was "performing full duties at work." (Doc. No. 20 Ex. 3 p. 91.) The opinion of Krumins was consistent with the PCE completed by Dr. Beckner in May of 2007, indicating that Murray was capable of sitting, standing, or walking for eight hours at a time, and lifting up to twenty pounds on an occasional basis. (*Id.* at 80–81.) Further, Dr. Krumins indicated that as of March 12, 2007, Murray had been "released to work full duty." (*Id.* at 77–79.) Dr. Beckner opined that Murray could do light duty work on May 10, 2007. (*Id.* at 82.) Despite Murray's assertions to the contrary, these capabilities clearly established Murray's ability to perform light work on a full-time basis. *See Archible v. Metro. Life Ins. Co.*, 85 F.Supp.2d 1203,

1220 (S.D.Ala.2000) (holding that light work entails significant standing and walking, or occasional lifting of up to twenty pounds).

Furthermore, Dr. Andrew's, an independent, board certified orthopedic surgeon, thoroughly reviewed Murray's medical records and opined that Murray was physically capable of working light duty on a full-time basis as of February 26, 2007. (Doc. No. 20 Ex. 3 p. 20.) An ERISA administrator is entitled to rely on the opinion of a qualified consultant who neither treats nor examines the claimant, but instead views the claimant's medical record. *See Hufford v. Harris Corp.*, 322 F.Supp.2d 1345, 1359 (M.D.Fla.2004). As such, the Court finds that Hartford Life was not wrong in relying on the professional assessments of Dr. Andrews. *See Giertz–Richardson v. Hartford Life and Accident Ins. Co.*, 536 F.Supp.2d 1280, 1291 (M.D.Fla.2008) (ruling that the claims administrator was "not wrong" to credit opinions of physicians who "reviewed Plaintiff's medical records").

Murray contends that proof of disability is found in Dr. Beckner's July 26, 2007 letter and Dr. Konsens' September 25, 2007 APS. (Doc. No. 21 p. 19.) Hartford Life argues that it had no duty to credit the July 26, 2007 letter because it is plainly inconsistent with Dr. Beckner's PCE. (Doc. No. 19 pp. 21–22.) While Dr. Beckner's letter is not "plainly inconsistent" as Hartford Life suggests, it does not prove that Murray was disabled as that term is defined in the Policy. As stated above, Murray's ability to sit, stand, or walk for up to eight hours at a time, and lift up to twenty pounds establishes that Murray had the functional capacity for light work. Further, Hartford Life cannot be faulted for failing to give Dr. Beckner's July 26, 2007 letter overriding significance since it was written after Murray learned his LTD

claim was denied and was unaccompanied by medical evidence. *See Gooden v. Provident Life & Acc. Ins. Co.*, 250 F.3d 329, 333–34 (5th Cir.2001) (finding no abuse of discretion when administrator did not give treating physician's changed opinion determinative weight because it was (1) contrary to physician's previous opinion; (2) written after the claimant learned his benefits were being terminated; and (3) unaccompanied by evidence that plaintiff's medical condition had changed since most recent evaluation). Finally, Hartford Life was correct in disregarding Dr. Konsens' APS as it detailed a period of disability which commenced after Murray's coverage under the Policy expired.[5]

After reviewing the administrative record, the Court concludes that both Hartford Life's initial decision to deny Murray's claim for LTD benefits in July 2007 and its decision on appeal to reaffirm the denial were not de novo "wrong." The evidence does not show that Murray was unable to perform the substantial and material duties of his job for a period of time sufficient to satisfy the Elimination Period in his Policy. Furthermore, the Policy documents support the job description applied by Hartford Life in denying LTD benefits, and the medical records support a finding that Plaintiff could perform light work and therefore his own occupation as an assistant manager at Publix. Under the *Doyle* approach, the Court need proceed no further in reviewing Hartford Life's decision. However, in the interest of thoroughness and to fully develop the legal issues in the event of an appeal, the Court will proceed to examine the remaining steps in the *Doyle* analysis.

## B. Step Two: Was Hartford Life Vested With Discretion?

■ Here, the parties disagree as to whether the plan documents expressly grant Hartford Life discretion in making benefit determinations. Specifically, the Policy states that "Hartford Life reserves the right to determine if Proof of Loss is satisfactory." (Doc. No. 1 Ex. A p. 42.) Murray argues that this language was not a grant of discretion for ERISA standard of review purposes. (Doc. No. 21 pp. 5–6.) However, in both *Tippitt v. Reliance Standard Life Ins. Co.*, 457 F.3d 1227 (11th Cir.2006), *aff'd* 276 Fed.Appx. 912 (11th Cir.2008), and *Levinson v. Reliance Standard Life Ins. Co.*, 245 F.3d 1321 (11th Cir.2001), the plan language required the insured to "submit[ ] satisfactory proof of Total Disability" to the insurer. In both cases, the Eleventh Circuit upheld the district court's application of the arbitrary and capricious standard of review, finding that both policies gave the administrator discretion to determine eligibility for benefits. *Tippitt*, 457 F.3d at 1234; *Levinson*, 245 F.3d at 1325; *see also Curran v. Kemper Nat. Servs., Inc.*, No. 04–14097, 2005 WL 894840, at *3 (11th Cir. Mar. 16, 2005) ("We have held that this type of language, requiring that proof be satisfactory or acceptable to the administrator, is sufficient to convey discretion and to apply the arbitrary and capricious standard of review.").[6] The Court declines Murray's invitation to disregard binding authority of the Eleventh Circuit. Both *Tippitt* and *Levinson* are controlling; accordingly, Hartford Life's discretion compels application of the deferential arbitrary and capricious standard.

---

5. Murray's LTD coverage terminated in March 2007 because he could not prove he was totally disabled through the Elimination Period.

6. *Curran*, as an unpublished opinion of the Eleventh Circuit, constitutes persuasive, and not binding, authority. *See* 11th Cir. R. 36–2 and I.O.P. 6.

**1352**

### C. Step Three: Was Hartford Life's Decision Supported By Reasonable Grounds?

 The appropriate inquiry is whether there was a reasonable basis for Hartford Life's decision, based upon the facts as known to the administrator at the time the decision was made. *See Doyle*, 542 F.3d 1352 at 1360. As long as the decision had a reasonable basis, it "must be upheld as not being arbitrary and capricious, even if there is evidence that would support a contrary conclusion." *White v. Coca–Cola Co.*, 542 F.3d 848, 856 (11th Cir.2008). If the "evidence is close," then the administrator did not abuse its discretion, and the requisite deference compels the affirmance of the administrator's decision. *Doyle*, 542 F.3d at 1363.

 Following *Glenn* and *Doyle*, and after considering the administrator's conflict, the Court concludes that Hartford Life's decision was neither "wrong" nor unreasonable, and therefore, not arbitrary or capricious. There is nothing in the totality of the circumstances that indicates that Hartford Life's conflict of interest was a major factor in its decision. Hartford Life investigated the case thoroughly and developed a complete record. In addition, Murray has failed to produce any evidence that Hartford Life's decision was affected by the fact that it insured the Policy. Based on the foregoing, the Court finds that even if Hartford Life's denials were determined to be de novo wrong, those denials nevertheless must be affirmed. Accordingly, Hartford Life's motion for summary judgment will be granted.

### V. CONCLUSION

Based on the foregoing, it is ORDERED as follows:

1. Defendant Hartford Life & Accident Insurance Company's Dispositive Motion for Summary Judgment (Doc. No. 19), filed on January 9, 2009, is GRANTED.

2. The Clerk shall enter a final judgment providing that Plaintiff David Murray shall take nothing on his claims against Defendant Hartford Life & Accident Insurance Company. The judgment shall further provide that the Defendant shall recover its costs of action.

3. The Clerk is directed to close the file.