**Kristy SCHWADE, Plaintiff,**

v.

**TOTAL PLASTICS, INC., Defendant.**

**Case No. 8:10–cv–2436–T–23MAP.**

United States District Court,
M.D. Florida,
Tampa Division.

Nov. 10, 2011.

Charles Steven Yerrid, David Dallas Dickey, Yerrid Law Firm, Tampa, FL, for Plaintiff.

Andrew Froman, Michelle I. Anderson, Fisher & Phillips, LLP, Tampa, FL, for Defendant.

## ORDER

STEVEN D. MERRYDAY, District Judge.

Kristy Schwade sues her former employer, Total Plastics, Inc., for healthcare benefits under an Employee Retirement Income Security Act ("ERISA") plan. Arguing that Schwade failed to exhaust administrative remedies, that the suit is time-barred, and that Schwade violated the plan by refusing to sign a subrogation agreement, Total Plastics moves (Doc. 20) for summary judgment.

## I.

### A.

Schwade noticed one day in May, 2007, that something was profoundly wrong with her five-month-old son, K.S., after he returned from daycare. Although precisely what happened to him remains unspecified, K.S.'s symptoms were consistent with "shaken baby syndrome." The daycare provider later pleaded guilty to aggravated child abuse. Having suffered catastrophic brain damage, K.S. remained in the hospital more than two months and required continuous medical attention thereafter. K.S. died at the age of four in January, 2011.

### B.

At the time of K.S.'s injury, Schwade participated in Total Plastics's self-funded ERISA employee health benefit plan ("the Plan"), of which K.S. was a beneficiary. K.S. is eligible for as much as a million dollars in benefits—if Schwade fulfills the necessary conditions under the Plan.

The Plan's summary includes a detailed subrogation agreement that entitles the Plan to recover "[a]ny amount from the first dollar that the [participant] ... is entitled to receive as a result of [an] Accident, Illness, or Injury or other medical condition, to the full extent of benefits paid or provided by the Plan." (Doc. 20, Ex. 5 at 60) Additionally, the Plan requires a participant to "execute documents (including a lien agreement) and deliver instruments and papers and do whatever else is necessary to protect the Plan's [subrogation] rights." (Doc. 20, Ex. 5 at 60) If the participant refuses to sign a supplemental subrogation agreement after submitting a claim, "the Plan has no obligation to make any payment for any treatment required as a result of the act or omission of any Other Party." (Doc. 20, Ex. 5 at 60)

Under the Plan, "[e]ach time a claim is submitted . . . the Covered Person will receive an Explanation of Benefits [ ] form that will explain how much the Plan paid toward the claim." (Doc. 20, Ex. 5 at 69) The Plan summary lists many reasons the Plan administrator might deny a claim, including "[e]nforcement of subrogation" and failure to "respond to a request for additional information needed to process the claim." (Doc. 20, Ex. 5 at 69–70) As to "additional information," the Plan summary further provides, "Determination Period on Hold: . . . . When claims information is missing, a notice requesting the necessary information will be sent to the Covered Person. The Covered Person then has 45 calendar days within which to provide the missing information." (Doc. 20, Ex. 5 at 69) After forty-five days without the information from the participant, the Plan administrator may deny the claim.

If the Plan administrator denies a claim, under the Plan a participant will receive "[a] claim denial notice, usually referred to as an Explanation of Benefits" that "explain[s] the specific reasons for the denial," "provide[s] a specific reference to pertinent Plan provisions on which the denial was based," and "[p]rovide[s] appropriate information as to the steps the Covered Person can take to submit the claim for appeal." (Doc. 20, Ex. 5 at 70) If a participant wishes to challenge a claim denial, the Plan summary requires that the employee "file the appeal within 180 days of the date [she] received the Explanation of Benefits [ ] form from the Plan showing that the claim was denied." (Doc. 20, Ex. 5 at 70) The Plan summary states that a participant may sue "[a]fter completing all mandatory appeal levels through this Plan," but that "[n]o such action may be filed against the Plan after three years from the date the Plan gives the Covered Person a final determination on their appeal." (Doc. 20, Ex. 5 at 72)

## C.

The Plan paid between $26,000 and $35,000 of K.S.'s initial medical expenses, until in late June, 2007, about two months after K.S.'s injury, the Plan administrator sent Schwade a supplemental subrogation agreement. This document informs that the Plan administrator cannot process a claim without "additional information" about K.S.'s injury. After a short questionnaire, the document states that the Plan may "recover payments from ANY settlement due [a participant or beneficiary] when the accident or illness is a result of negligence . . . ." (Doc. 20, Ex. 6) (caps in original) The document closes with a warning that "FAILURE OR REFUSAL TO EXECUTE THIS DOCUMENT RELIEVES THE PLAN OF ANY AND ALL LEGAL, FINANCIAL OR CONTRACTUAL OBLIGATION FOR ANY EXPENSES INCURRED BY THE PARTICIPANT." (Doc. 20, Ex. 6) (caps in original) Because Schwade never returned the supplemental subrogation agreement, the Plan administrator stopped paying K.S.'s claims. Explanations of benefits sent to Schwade between August and November, 2007, state, "[w]e need updated accident information to process your claim. Please call [phone number] or visit [website]." *E.g.* (Doc. 20, Ex. 9) The claims requiring "updated accident information" accrued between May and August 10, 2007, and embody the money Schwade seeks in this action. For a claim that accrued after August 10, 2007, the explanations of benefits state, "[c]harges incurred after the date coverage ends are not covered." After Schwade quit her Total Plastics job in August, 2007, to attend to K.S., Florida's Medicaid program provided money for K.S.'s care. Schwade concurs that Medicaid covered claims accruing after August 10, 2007.

In June, 2008, Schwade's attorney sent the Plan administrator a letter asking for information. A June 18th response from the Plan administrator is insistent:

> [W]e need additional information from the member, [Schwade,] before we can determine benefits. Please have [Schwade] sign the attached Subrogation Agreement and return to us .... [P]er [the subrogation provision in the Plan summary] this needs to be signed before we can determine benefits.

(Doc. 3, Ex. 4) The attached subrogation agreement again warns that a failure to sign the agreement voids the Plan's obligations to Schwade. A July 1st letter from the Plan administrator quotes the subrogation provision of the Plan summary and states, "At this time no additional charges will be considered until the Subrogation Agreement is received." (Doc. 3, Ex. 5)

Ignoring the Plan summary, the warnings of the Plan administrator, and the impending legal consequences to Schwade if she failed to sign a subrogation agreement, Schwade's attorney in a July 24, 2008, letter complains that "[t]he sole reason" for the absence of claim payments is "Schwade['s] not signing a boiler plate subrogation agreement." (Doc. 3, Ex. 6) Schwade's attorney dismissed the Plan's "subrogation language" as "totally unacceptable" and declined on behalf of Schwade to sign.

In a November 4, 2008, letter, Schwade's attorney claims that the subrogation requirement "appear[s] to prohibit any civil action on K.S.'s behalf because it purports to provide that the Plan would be reimbursed first and in full ...." Schwade's attorney offers a deal (and a threat): "We propose that the Plan and [K.S.] share equally (50/50 split) in whatever recovery is obtained after payment of the costs and attorney fees .... Without the foregoing agreement, the Plan and Total Plastics

essentially has [*sic*] no chance of a recovery." (Doc. 3 Ex. 7) A March 12, 2009, letter repeats the offer allowing the plan half an award—half, that is, of what remains after Schwade's attorney receives remuneration in full. Finally, a December 14, 2009, letter states:

> [T]he demand for our clients to sign a subrogation agreement that would only benefit Total Plastics without any attorney compensation or reimbursement for the costs was and remains totally unacceptable. I find it hard to believe that such subrogation language is valid under ERISA and [that] the subject "subrogation agreement" is required before the [medical] providers are paid.

(Doc. 3, Ex. 9)

Without an agreement with the Plan, Schwade sued the daycare provider, the daycare center, and others.

### D.

Tampa General Hospital, which treated K.S., sued (Doc. 2) Schwade for more than $600,000. (Doc. 2) Schwade removed to federal court and in November, 2010, submitted a third-party complaint (Doc. 4) against Total Plastics. A January, 2011, order (Doc. 12) remands Tampa General's action against Schwade but retains Schwade's action against Total Plastics. Although her benefits are capped at a million dollars, Schwade sues Total Plastics for more than $1.4 million in expenses allegedly owed under the Plan.

■ Total Plastics argues (1) that the Plan empowers the Plan administrator to require Schwade to sign a subrogation agreement; (2) that, because Schwade failed to appeal within the Plan's 180–day limitation, Schwade failed to exhaust her administrative remedies; (3) that Schwade failed to plead exhaustion in the complaint; and (4) that Schwade failed to sue within

the Plan's three year limitation.[1] Schwade responds to Total Plastics's arguments and counters that she is entitled to benefits without a subrogation agreement because signing a subrogation agreement (1) conflicts with Florida's Medicaid law, (2) results in unfairness, and (3) inhibits Schwade's ability to sue those responsible for K.S.'s injury and death.

## II.

▮ Asserting that "questions of fact exist," Schwade argues as if this action is subject to the typical summary judgment standard. (Doc. 25 at 3) However, the primary issue is the reasonableness of the Plan administrator's decision. *Epolito v. Prudential Ins. Co. of America,* 737 F.Supp.2d 1364, 1369–70 (M.D.Fla.2010) (Howard, J.). If an ERISA plan fails to grant the plan administrator discretion to decide a claim and construe the plan, "the district court [ ] determin[es] *de novo* whether the administrator's decision was wrong rather than whether there are questions of material fact and whether the parties are entitled to judgment as a matter of law." *Murray v. Hartford Life & Acc. Ins. Co.,* 623 F.Supp.2d 1341, 1349 (M.D.Fla.2009) (Conway, J.). Alternatively, if an ERISA plan grants discretion to the plan administrator to decide a claim and construe the plan, the plan administrator is entitled to deference, in which instance "summary judgment is simply a vehicle for deciding the issue and the non-moving party is not entitled to the usual inferences in its favor." *D & H Therapy Assocs., LLC v. Boston Mut. Life Ins. Co.,* 640 F.3d 27, 34 (1st Cir.2011); *Blankenship v. Metropolitan Life Ins. Co.,* 644 F.3d 1350, 1354 & n. 4 (11th Cir.2011).

▮ The Total Plastics Plan grants the administrator "full and sole discretion[ ]" to interpret the Plan and decide a benefit claim. (Doc. 20, Ex. 5 at 3) The next question is how much discretion a Plan administrator is allowed. Schwade's attorney misguidedly argues (Doc. 25 at 14) for a "heightened arbitrary and capricious" standard that the Eleventh Circuit has discarded. *See Doyle v. Liberty Life Assur. Co. of Boston,* 542 F.3d 1352, 1359–60 (11th Cir.2008). Instead:

> For a court reviewing a plan administrator's benefits decision, the present [ ] test goes this way:
>
> (1) Apply the *de novo* standard to determine whether the claim administrator's benefits-denial decision is "wrong" (i.e., the court disagrees with the administrator's decision); if it is not, then end the inquiry and affirm the decision.
>
> (2) If the administrator's decision in fact is *"de novo* wrong," then determine whether he was vested with discretion in reviewing claims; if not, end judicial inquiry and reverse the decision.
>
> (3) If the administrator's decision is *"de novo* wrong" and he was vested with discretion in reviewing claims, then determine whether "reasonable" grounds supported it (hence, review his decision under the more deferential arbitrary and capricious standard).
>
> (4) If no reasonable grounds exist, then end the inquiry and reverse the administrator's decision; if reasonable grounds do exist, then determine if he operated under a conflict of interest.
>
> (5) If there is no conflict, then end the inquiry and affirm the decision.

---

1. Also, Total Plastics responds to an allegation in the complaint that Schwade need not re-pay the Plan until she is made whole. Because the Plan summary explicitly rejects the "make whole" doctrine, Total Plastics may demand subrogation from Schwade even if Schwade is not first "made whole." *See Cagle v. Bruner,* 112 F.3d 1510, 1521 (11th Cir. 1997). In any event, Schwade abandons the argument in her response.

(6) If there is a conflict, the conflict should merely be a factor for the court to take into account when determining whether an administrator's decision was arbitrary and capricious.

*Blankenship*, 644 F.3d at 1355.

■■■■■ A conflict of interest exists because Total Plastics both decides claims and pays part of the benefits under the Plan.[2] *See Metropolitan Life Ins. Co. v. Glenn*, 554 U.S. 105, 112–13, 128 S.Ct. 2343, 171 L.Ed.2d 299 (2008); *Corkill v. Hartford Life and Accident Ins. Co.*, 435 F.Supp.2d 1192, 1197 (N.D.Fla.2005) (Vinson, J.). Although this conflict is "a factor" in step six, "the burden remains on the plaintiff to show [a] decision was arbitrary." 644 F.3d at 1355; *Murray*, 623 F.Supp.2d at 1352. The distinction is not important in this instance because no issue in this action requires analysis at step six.

### III.

On the one hand, as explained earlier, Schwade is subject to the subrogation provisions of the Plan. On the other, Section 409.910(6), Florida Statutes, ensures that Florida's Medicaid program "automatically" enjoys an absolute subrogation right as to "any third-party benefit for the full amount of medical assistance provided by Medicaid." *See Russell v. Agency for Health Care Admin.*, 23 So.3d 1266 (Fla. 2d DCA 2010); *Agency for Health Care Admin. v. Estabrook*, 711 So.2d 161 (Fla. 4th DCA 1998). Hence, if Schwade recovers money in the suit against the daycare provider, the daycare center, and others, both the Plan and Florida's Medicaid program hold a subrogation right against the award. Schwade argues that she is entitled to benefits even though she never signed the Plan's subrogation agreement because (1) the Plan's requiring Schwade to sign was unfair and unreasonable, and (2) Schwade was unable to sign and is excused from signing because of the subrogation obligation toward Florida's Medicaid program.

### A.

■■■■■ Schwade should not "find it hard to believe," as Schwade's response claims, that the Plan includes a comprehensive subrogation clause as well as a requirement that an employee sign an additional subrogation agreement after an injury. ERISA does not "mandate what kind of benefits employers must provide if they choose to have [an ERISA benefits] plan," and "employers have large leeway to design ... welfare plans as they see fit." *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 833, 123 S.Ct. 1965, 155 L.Ed.2d 1034 (2003). Unsurprisingly, many ERISA benefit plans include a sweeping grant of subrogation. *See, e.g., Zurich Am. Ins. Co. v. O'Hara*, 604 F.3d 1232, 1236–38 (11th Cir.2010); *Admin. Comm. of Wal–Mart Stores, Inc. Assocs. Health and Welfare Plan v. Shank*, 500 F.3d 834, 838 (8th Cir.2007); *Waller v. Hormel Foods Corp.*, 120 F.3d 138, 139–40 (8th Cir.1997) ("A subrogation provision affects the level of benefits conferred by the plan, and ERISA leaves that issue to the private parties creating the plan"); *Ryan by Capria–Ryan v. Fed. Express Corp.*, 78 F.3d 123, 127 (3d Cir.1996) ("ERISA [does not] bar [subrogation] clauses or otherwise regulate their content"); *Cutting v. Jerome Foods, Inc.*, 993 F.2d 1293 (7th Cir.1993); *Trident Reg'l Health Sys. v. Polin*, 948 F.Supp. 509,

---

**2.** Total Plastics claims that a third-party, Fiserv Health, determined benefits, but the Plan summary names Total Plastics as the Plan administrator and the Plan summary empowers only the Plan administrator to determine benefits. (Doc. 20, Ex. 5 at 2–3) The Plan summary states that Fiserv Health merely "provides ministerial administrative services such as claim payments and enrollment." (Doc. 20, Ex. 5 at 2)

511–19 (D.S.C.1996). A subrogation provision in a plan summary is, in a word, standard.

An ERISA plan utilizes a subrogation agreement for a good reason. Recoupment of plan expenditures is "crucial to the financial viability of self-funded ERISA plans." *Shank*, 500 F.3d at 838; *O'Hara*, 604 F.3d at 1238. Holding that an ERISA plan may demand that an employee "sign [the plan's] standard subrogation agreement before paying benefits," the Eleventh Circuit explains:

> Once benefits are paid, participants and beneficiaries have little incentive (other than the fear of a lawsuit) to sign a subrogation agreement. If [a plan] cannot require the agreement beforehand, it often will have to resort to lawsuits or at least the threat of lawsuits to obtain the agreements. Lawsuits cost money, sometimes a lot of it. . . . In short, having the agreement in hand before paying benefits provides significant protection to trust assets.

*Cagle v. Bruner*, 112 F.3d 1510, 1520 (11th Cir.1997). "While [the participant] is exclusively concerned with her own benefits, [the plan] is concerned with the benefits of all [ ] employees," *Trident*, 948 F.Supp. at 519; *O'Hara*, 604 F.3d at 1237; a subrogation agreement furthers the salutary purpose of ensuring that the plan administrator preserves the plan's assets for the totality of the plan's members.

 Schwade offers no persuasive justification for failing to sign the subrogation agreement, or rather, offers no justification that allows Schwade to alter the terms of the Plan and collect benefits in this action. First and most obviously, an attorney cannot hold his client's welfare and the plan's welfare hostage for the sake of attorney fees. For example, a party before the Third Circuit in *Ryan* won a tort suit against a third-party and asserted an entitlement to attorney fees ahead of an ERISA plan's subrogation right. The Third Circuit was unimpressed:

> The [plaintiffs'] argument that the Plan would be unjustly enriched if it was not required to pay a pro rata share of their attorney's fees is entirely without merit. Enrichment is not 'unjust' where it is allowed by the express terms of the plan . . . . Indeed, it would be inequitable to permit the [plaintiffs] to partake of the benefits of the Plan and then, after they had received a substantial settlement, invoke common law principles to establish a legal justification for their refusal to satisfy their end of the bargain.

*Ryan*, 78 F.3d at 127–28 (citations and quotations omitted); *see also O'Hara*, 604 F.3d at 1238. Through her attorney, Schwade gambled—and bluffed—when claiming that no suit against the daycare parties could occur without a fifty-fifty-after-attorney-fees deal. After the Plan stood firm Schwade sued the daycare parties anyway. Besides, even if Schwade were correct, and further, even if the deal were fair to the Plan and the Plan's other members, "courts have no right to torture [an ERISA plan's] language in an attempt to force particular results." *Hunt v. Hawthorne Assocs., Inc.*, 119 F.3d 888, 911 (11th Cir.1997). "To the exact contrary, straightforward language in an ERISA regulated [plan] should be given its natural meaning." 119 F.3d at 911.

The Plan summary unambiguously entitles the Plan to a subrogation agreement from Schwade. Without a subrogation agreement, the Plan summary unambiguously entitles the Plan not to pay Schwade's claims. By attempting to drive a hard bargain with an ERISA plan for attorney fees, Schwade violated the existing bargain and left K.S. with no benefits. (Schwade objects that, because she holds no settlement, this action differs from an action such as *Ryan*, in which an employee

**1266**

holding a settlement seeks to evade a plan's subrogation right. The distinction is meaningless. A request for court-sanctioned alteration of the plan is equally untenable before and after an employee settles with an at-fault third-party—no advantage accrues from plotting ahead of time to breach the plan.)

A plea that "fairness" requires re-writing the Plan fails. Worrying that the day-care parties can pay little in damages, Schwade claims to pursue merely "a fair and equitable distribution of any money that may be recovered in the future." (Doc. 25 at 2) However, the Plan seeks not a windfall but only the reimbursement of money paid (or money the Plan would pay after execution of the subrogation agreement). Money from the Plan is partly an expense of Schwade's former fellow employees, and the Plan must remain financially sound to help other employees pay for medical hardship. *See O'Hara*, 604 F.3d at 1238. Importantly, again, the Plan's subrogation right "is not 'unjust' where it is allowed by the express terms of the plan." *Ryan*, 78 F.3d at 127.

 The responsibility of a participant to re-pay the Plan, even from a meager recovery, helps to maintain a manageable price for the Plan (and thus to maintain the existence of the Plan). Consequently, ERISA avoids dictating the correct balance between each participant's responsibilities and the cost of a plan. *Cf. Kennedy v. Conn. Gen. Life Ins. Co.*, 924 F.2d 698, 699, 702 (7th Cir.1991) ("[w]hether full indemnity is preferable to a co-payment system [in an ERISA plan] is a question for the marketplace"); *Hozier v. Midwest Fasteners, Inc.*, 908 F.2d 1155, 1160 (3d Cir.1990) ("Congress was forced to balance its desire to regulate [ERISA] plans more extensively against the danger that increased regulation would deter employers from creating such plans in the first place"). In any event, a rule allowing a

participant an extra-contractual award from a plan because of the difficulty of an individual case is unworkable. ERISA's "repeatedly emphasized purpose" is "to protect contractually defined benefits." *Mass. Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 148, 105 S.Ct. 3085, 87 L.Ed.2d 96 (1985). A "hardship" exception implied into each ERISA plan subrogation provision would transgress ERISA's purpose and facilitate plan-crippling litigation. *See Cagle*, 112 F.3d at 1520. Most plan participants who suffer a tort suffer a hardship, and some of the parties that commit a tort lack money. Many victims, such as Schwade, want to sue to escape the obligation to re-pay the plan. Even if the plan always won, case-by-case litigation of "hardship" would drain a plan's assets (that is, transform money for medical care into money for a lawyer). Requiring Schwade to follow the Plan's requirement and sign a subrogation agreement is both "fair" and necessary.

**B.**

 Schwade argues that Florida's Medicaid law blocks Schwade from signing the subrogation agreement. One short response to this claim is that the Plan may stand on the plain language of the Plan summary. *See Hunt*, 119 F.3d at 911. No signed subrogation agreement, no benefits. Another response is that Schwade's refusal to sign the subrogation agreement was not the result of Schwade's concern for Florida's Medicaid program or governing law. Schwade's attorney wrote:

We propose that the Plan and [K.S.] share equally (50/50 split) in whatever recovery is obtained after payment of costs and attorney fees. As mentioned [earlier], this case is further complicated because [K.S.] also received Medicaid benefits, which under Florida law is granted the right to recover the benefits it paid. I do not know but expect that

Medicaid's recovery rights would be primary to any insurance subrogation claims. Accordingly, any division between [K.S.] and the Plan would be secondary to any other liens which may take priority.

(Doc. 3, Ex. 7) Schwade rejected the subrogation agreement as unfair and as counterproductive, but not as a violation of Florida's Medicaid law, about which Schwade's attorney professed ignorance ("I do not know . . .").

Florida law and federal law ensure payment priority for Medicaid. Under 42 U.S.C. § 1396a(25)(H) a state must require that a state Medicaid program "acquire[s] the rights of [a Medicaid recipient] to payment by any other party for [ ] health care" paid by Medicaid. *See also* 29 U.S.C. § 1144(b)(8) (excepting from ERISA's preemption a state cause of action that furthers Medicaid reimbursement); 42 U.S.C. § 1396k(a)(1)(A) (directing a state to require each Medicaid recipient to assign the state "any rights . . . to support . . . and to payment for medical care from any third party"); 29 U.S.C. § 1169(b). Under Section 409.910(13), Florida Statutes, no action of a Medicaid recipient can prejudice the reimbursement right of the Florida Medicaid program. As Schwade correctly noted, Medicaid recovery trumps the fulfillment of "any" private subrogation agreement. "In Florida, a Medicaid recipient entering into a settlement of a tort claim with a third party does so against the backdrop" of the subrogation right of Florida's Medicaid program. *Russell*, 23 So.3d 1266, 1269. Schwade understood that an agreement between Schwade and the Plan to pay Schwade's attorney first would leave an enforceable, senior lien in favor of Medicaid. Schwade fails to explain why the same is not true of an agreement between Schwade and the Plan to devote any recovery in Schwade's lawsuit to the Plan until the Plan is re-paid.

No further discussion is necessary on the Plan's refusal to pay the benefit without a subrogation agreement. The refusal was *"de novo* correct" under the terms of the Plan summary. *See Blankenship*, 644 F.3d at 1355.

## IV.

The consequence of Schwade's failure to sign a subrogation agreement depends on whether Schwade failed to exhaust her administrative remedy.

## A.

 As Total Plastics notes, a plaintiff should plead exhaustion of the administrative remedy. *Byrd v. MacPapers, Inc.*, 961 F.2d 157, 160–61 (11th Cir. 1992); *In re Managed Care Litigation*, 595 F.Supp.2d 1349, 1353 (S.D.Fla.2009) (Torres, Mag. J, *adopted by* Moreno, J.) (citing *Byrd* ); *Nat'l Renal Alliance, LLC v. Blue Cross and Blue Shield of Ga., Inc.*, 598 F.Supp.2d 1344, 1356 (N.D.Ga.2009) (Forrester, J.) (citing *Byrd* ). The complaint alleges that "[a]ll conditions precedent to this action has [*sic* ] been fulfilled, waived, or have otherwise occurred" (Doc. 3 at 12), but "pleading that 'all conditions precedent have been satisfied' or that all 'such conditions have been waived or excused' is not sufficient." *Bacon v. Stiefel Labs., Inc.*, 677 F.Supp.2d 1331, 1338 (S.D.Fla.2010) (King, J.) (quoting *Variety Children's Hosp. v. Century Medical Health Plan*, 57 F.3d 1040, 1042 n. 2 (11th Cir.1995)); *C.P. Motion, Inc. v. Aetna Life Ins. Co.*, 268 F.Supp.2d 1346, 1348 (S.D.Fla.2003) (Ungaro–Benages, J.). But, because the complaint alleges in detail the letters exchanged between Schwade and Total Plastics, the complaint includes just enough for a reasonable reader to infer exhaustion of Schwade's administrative remedy.

## B.

 A reasonable limitation in an ERISA plan is enforceable. *Northlake Reg'l Med. Ctr. v. Waffle House System Emp. Benefit Plan,* 160 F.3d 1301, 1303 (11th Cir.1998). Total Plastics argues that Schwade's suit is barred because "she waited more than three years after the date she terminated her participation in the Plan ... to [sue]." (Doc. 20 at 15) The limitation in the Plan summary says nothing about an employee ceasing participation in the Plan. Rather, the limitation bars an action against the Plan more than "three years from the date the Plan gives the Covered Person a final determination on their appeal." (Doc. 20, Ex. 5 at 72) Total Plastics, apparently without a sense of contradiction, admits in the paragraph arguing that the action is barred that "Schwade never appealed." (Doc. 20 at 15)

The Plan's limitation governs cases in which the participant appeals and receives a disposition of the appeal from the Plan administrator. If a participant fails to appeal, the pertinent limitation in the Plan summary is the 180–day time limit for submitting an administrative appeal.

## C.

 A plaintiff may not sue in federal court until the administrative remedy enumerated in an ERISA plan summary is exhausted. *E.g., Lanfear v. Home Depot, Inc.,* 536 F.3d 1217, 1223–24 (11th Cir. 2008); *Bickley v. Caremark RX, Inc.,* 461 F.3d 1325, 1328 (11th Cir.2006); *Watts v. BellSouth Telecommunications, Inc.,* 316 F.3d 1203, 1204, 1207 (11th Cir.2003).

 The exhaustion requirement is "strictly enforce[d] ... with certain caveats reserved for exceptional circumstances." *Perrino v. Southern Bell Tel. & Tel. Co.,* 209 F.3d 1309, 1315 (11th Cir. 2000). The "exceptional circumstances" are "when resort to administrative reme-dies would be futile or the remedy inadequate [and] where a claimant is denied 'meaningful access' to the [plan's] administrative review scheme." *Perrino,* 209 F.3d at 1316; *see also Watts,* 316 F.3d at 1207 (adding an exception for a claimant's reasonable misinterpretation of the plan summary). In *Perrino,* the plan participants argued "that exhaustion should not be required where an ERISA plan fails to comply in full with all ERISA regulations." 209 F.3d at 1315. *Perrino* rejects the idea that a "technical deficiency" in a plan's claim procedure automatically justifies a waiver of the exhaustion requirement:

> Our prior precedent makes clear that the exhaustion requirement for ERISA claims should not be excused for technical violations of ERISA regulations that do not deny plaintiffs meaningful access to an administrative remedy procedure through which they may receive an adequate remedy. For instance, in [*Counts v. American General Life and Accident Insurance Company,* 111 F.3d 105, 107 (11th Cir.1997) ], the plaintiff argued that the district court erred in not excusing the exhaustion requirement because his employer's termination letter failed to comply precisely with ERISA's notice requirements under 29 U.S.C. § 1133 and 29 C.F.R. § 2560.503–1(f). The district court acknowledged that the termination letter was technically deficient in some respects, but concluded that "the letter substantially complied with the notice requirements because, taken as a whole, it supplied Counts with a statement of reasons that, under the circumstances of the case, permitted a sufficiently clear understanding of the administrator's position to permit effective review."

> On appeal, we affirmed the district court's application of the exhaustion requirement despite the employer's noncompliance with the ERISA notice

provision .... The clear import of our decision was the conclusion, that though employees should not have their ERISA claims adversely affected by an employer's technical noncompliance with ERISA regulations, so too, they should not be able to avoid the exhaustion requirement where technical deficiencies in an ERISA claims procedure do not hinder effective administrative review of their claims.

*Perrino,* 209 F.3d at 1317–18 (citations and footnote omitted); *see also Lacy v. Fulbright & Jaworski,* 405 F.3d 254, 256–57 (5th Cir.2005) ("[a]t least seven [ ] federal appeals courts ... [hold] that substantial rather than strict compliance with ERISA § 1133 and DOL Regulation § 2560.503–1(f) is all that the law requires. We join those courts today ...."); *Terry v. Bayer Corp.,* 145 F.3d 28, 39 (1st Cir.1998) ("ERISA notice requirements are not meant to create a system of strict liability for notice failures"); *Heller v. Fortis Benefits Ins. Co.,* 142 F.3d 487, 492–93 (D.C.Cir.1998).

■■■ The Plan administrator's processing of Schwade's claims included two defects. First, under the Plan summary the Plan administrator could not deny Schwade's claims for lack of additional information until August 12, 2011, forty-five days after June 28, 2007, the date on the proposed subrogation agreement that Schwade never signed. Yet, as Total Plastics admits, "[t]he first [Explanation of Benefits] showing a denial of benefits ... is dated August 8, 2007." (Doc. 20 at 9) Hence, Total Plastics prematurely denied some claims in violation of the Plan's "Determination Period on Hold" provision. Second, no explanation of benefits sent to Schwade cites a specific Plan provision that undergirds the claim decision, as is required by both the Plan summary and 29 C.F.R. § 2560.503–1(g) in the Department of Labor's ERISA regulation.

The deficiencies in the Plan administrator's claim denials "are technical deficiencies in an ERISA claims procedure [that] do not hinder effective administrative review" of Schwade's claims. *Perrino,* 209 F.3d at 1318. In November, 2007, Schwade had the subrogation agreement, which requested additional information, and Schwade had the explanations of benefits that denied her claims. Although devoid of a statement equivalent to "Your claim is denied," each explanation conveys unmistakably that the Plan refused to pay a claim—costs are listed under "Amount Not Payable" and "Provider May Bill You." Although each explanation of benefits fails to cite a provision in the Plan summary, each explanation of benefits states, as the reason for the denial, that Schwade needed to provide "updated accident information." Because Schwade had the proposed subrogation agreement that stated "I am unable to process this claim without additional information from you," followed by a questionnaire, Schwade could know easily—even without contacting the Plan administrator—the additional information required. In any event, each explanation of benefits states "YOUR IMMEDIATE RESPONSE IS REQUIRED" (caps in original) and provides in several places information on contacting the Plan administrator. Each explanation of benefits advises how to appeal a claim denial and warns that an appeal must occur within one hundred eighty days. In sum, the explanations of benefits were ample notification that the Plan had denied claims and that an appeal was due within a stated time. The only detectable defects were the absence of a citation to the Plan provision on which the denial was based and the four-days' premature denial of a few claims—"technical defects" that in no way "hinder[ed] effective administrative review" for Schwade. By June, 2008, when Schwade's attorney sent a letter, the 180–

day window to appeal was closed. Schwade failed to exhaust her administrative remedy.

 Schwade states, "[a]lternatively, given the Plan's behavior, any further effort by [Schwade] to communicate with the Plan or resort to the administrative process would [have been] futile." (Doc. 25 at 16) First, other than the two "technical deficiencies," the Plan administrator acted in accord with the terms of the Plan. Second, a futility argument is closed to Schwade because Schwade needed to at least attempt to pursue an administrative remedy. *See Lanfear*, 536 F.3d at 1225. Third, "bare allegations of futility are no substitute for the 'clear and positive' showing of futility required before suspending the exhaustion requirement." *Bickley*, 461 F.3d at 1330.[3]

## V.

The motion (Doc. 20) for summary judgment is **GRANTED.** The Clerk shall enter judgment for the defendant and against the plaintiff and close the case.

## *AMENDED ORDER*

Kristy Schwade moves (Doc. 40) under Rule 59(e), Federal Rules of Civil Procedure, for reconsideration of a summary judgment in favor of Schwade's former employer, Total Plastics.

Schwade's ERISA health benefits plan ("the Plan") declined to pay medical expenses for Schwade's son unless Schwade complied with the Plan by signing a subrogation agreement. Schwade refused. From August to November, 2007, the Plan sent Schwade an explanation of benefits denying each claim. The Plan requires Schwade to administratively appeal a denial within 180 days. Schwade failed to appeal on each occasion. For eighteen months (June, 2008, to December, 2009) after expiration of the time for administrative appeal, Schwade's attorney sent sporadic letters to the Plan proposing that the

**3.** Schwade fails to raise her most promising challenge to the exhaustion requirement. In 2002 (after *Perrino* ), the Secretary of Labor issued 29 C.F.R. § 2560.503–1(*l* ), which states, "[i]n the case of the failure of a plan to establish or follow claims procedures consistent with the requirements of this section, a claimant shall be deemed to have exhausted the administrative remedies available under the plan. . . ." In commentary interpreting the regulation, the Department of Labor asserts that Section 2560.503–1(*l* ) replaces the "substantial compliance" test, applied by the majority of the courts of appeals, with a standard under which any infraction, however inconsequential, of the ERISA notice requirement frees a participant to sue his plan. Pension and Welfare Benefits Administration, *ERISA; Rules and Regulations for Administration and Enforcement; Claims Procedure*, 65 Fed. Reg. 70246–01, 70255–56 (2000).

However, a search reveals no court of appeals that has followed the Department of Labor's discountenance of the "substantial compliance" test for a notice defect. In fact, since 2002 the Second, Fourth, Fifth, Sixth,

and Seventh Circuits have applied the "substantial compliance" standard to the ERISA notice requirement. *Lacy*, 405 F.3d at 256–57; *Ponsetti v. GE Pension Plan*, 614 F.3d 684, 693 (7th Cir.2010); *Hobson v. Metropolitan Life Ins. Co.*, 574 F.3d 75, 87–88 (2d Cir.2009); *Gagliano v. Reliance Standard Life Ins. Co.*, 547 F.3d 230, 237 (4th Cir.2008); *Wenner v. Sun Life Assur. Co. of Canada*, 482 F.3d 878, 882 (6th Cir.2007). A strict compliance standard radically undercuts the aim of the exhaustion requirement, which protects a plan against financial loss from frivolous lawsuits and unnecessary judicial intervention. *See Bickley*, 461 F.3d at 1330; *see also Bernstein v. CapitalCare, Inc.*, 70 F.3d 783, 788–89 (4th Cir.1995); *Hozier*, 908 F.2d at 1160 (discussing "Congress's concern with minimizing employers' [ERISA] compliance costs"). The Department of Labor's interpretation is probably entitled to no deference, *see Goldman v. Hartford Life and Acc. Ins. Co.*, 417 F.Supp.2d 788, 803–05 (E.D.La.2006), but even with deference, the strict compliance standard is apparently unendorsed, probably unreasonable, and certainly rejected.

Plan pay benefits but compromise the contractual right to subrogation. The Plan twice refused further consideration of a claim unless Schwade signed a subrogation agreement. The Plan plainly declined further negotiation. Another year passed, and in November, 2010, Schwade sued Total Plastics, which administers the Plan, for the benefits. A November 10, 2011, order (Doc. 31; 837 F.Supp.2d 1255, 2011 WL 5459649) concludes that Schwade's failure to exhaust her administrative remedy (that is, her failure timely to appeal) bars the action, and the order concludes further that under the Plan's unambiguous terms the Plan correctly denied Schwade's claims.

## I.

■ Schwade's motion for reconsideration is more carefully crafted than her opposition to the motion for summary judgment; not coincidentally, the argument section is nearly four times longer. (Docs. 25 at 15–20; 40 at 4–23) Be that as it may, a Rule 59(e) motion that re-argues a point or that raises a new point without a reason for the previous omission should fail. *Wilchombe v. TeeVee Toons, Inc.*, 555 F.3d 949, 957 (11th Cir.2009); *Arthur v. King*, 500 F.3d 1335, 1343 (11th Cir.2007); *see also WTC Captive Ins. Co., Inc. v. Liberty Mut. Fire Ins. Co.*, 537 F.Supp.2d 619, 624 (S.D.N.Y.2008) ("motions for reconsideration are not intended to save the parties from the consequences of their own research neglects"); *Ctr. For Public Integrity v. F.C.C.*, 515 F.Supp.2d 167, 169 n. 1 (D.D.C.2007) ("[a] plaintiff's failure to investigate a possible argument prior to the judgment does not make the results of its [later] research 'new evidence' for purposes of Rule 59(e)"). In any event, Schwade's action continues to fail on the merits.

■ Schwade objects that the November 10th order wrongly applies ERISA's special legal standard when assessing whether Schwade exhausted her administrative remedy. Although Schwade misses the transition, the November 10th order (1) applies ERISA's six-step standard to review the Plan's decision to deny benefits and (2) applies the normal summary judgment standard to determine whether Schwade exhausted her administrative remedy. After discussing the Plan's decision to deny benefits, the order explicitly applies the special ERISA standard. (Doc. 31 at 16) ("the [Plan's refusal to pay benefits] was '*de novo* correct' under the terms of the Plan summary"). The order never mentions the ERISA standard after discussing whether Schwade exhausted her administrative remedy; instead, the order assesses the undisputed facts and concludes that no reasonable question exists as to whether Schwade failed to exhaust her administrative remedy. When discussing the action as a whole, the order states that "the *primary* issue is the reasonableness of the Plan administrator's decision" (Doc. 31 at 7) (emphasis added); but not the "only" issue, as the balance of the order demonstrates. Schwade's Rule 59(e) motion notwithstanding, no error appears.

■ In the Rule 59(e) motion, Schwade argues again that the Plan provided insufficient notice of the claim denials. As the November 10th order explains (Doc. 31 at 4, 20–21), in each 2007 explanation of benefits the Plan told Schwade repeatedly, even emphatically, that her claims were unpaid, that she needed to contact the Plan and to provide more information (contrary to Schwade's objection, this reminder means that the Plan informed Schwade of the reason for the claim denials), and that she faced an appeal deadline. The Plan provided abundant notice. Schwade adds the argument that exhaustion is excused because the Plan failed to comply with 29 C.F.R. § 2560.503–1(*l*), which purports to

demand perfect compliance with each ERISA notice regulation. Without acknowledgment or apology, Schwade raises a regulation she evidently discovered while reading the November 10th order, which both notes Schwade's strange omission to mention 29 C.F.R. § 2560.503–1($l$) (perhaps "her most promising" argument) and explains that 29 C.F.R. § 2560.503–1($l$) is inapplicable. (Doc. 31 at 22 n. 3)

Schwade continues to insist that, because of insufficient notice of each claim denial, the 180–day appeal limitation tolled until the Plan in 2008 responded to an inquiry from Schwade's attorney. Even if one ignores the plentiful notice Schwade received in the 2007 explanations of benefits and assumes a tolling until 2008, Schwade fails to explain and justify her ignoring the Plan's appeal procedure in 2008. Even considered in isolation, the Plan's 2008 letters contain the elements necessary to deny each claim. (The Plan summary states that the Plan will "usually"—but not always—label a claim denial notice an "Explanation of Benefits." (Doc. 3, Ex. 5 at 70)) Schwade concludes that she "constructively" appealed but cites no authority (none exists) that explains if and how a "constructive" appeal is possible. Schwade instead cites authority that addresses the futility exception to the exhaustion requirement.

 As the November 10th order explains, the Plan evinced no sign that an appeal was futile; Schwade waived a futility argument by failing to at least attempt an appeal, *Lanfear v. Home Depot, Inc.,* 536 F.3d 1217, 1225 (11th Cir.2008); and Schwade provides only "bare allegations of futility," which are "no substitute for the 'clear and positive' showing of futility" that justifies suspending the exhaustion requirement. *Bickley v. Caremark RX, Inc.,* 461 F.3d 1325, 1330 (11th Cir.2006). In the Rule 59(e) motion Schwade appears to argue for the first time that the Plan's

failure to respond to her final letters indicated that an appeal was futile. (More likely, the Plan reasonably concluded that continuing to engage Schwade was futile.) Without resort to, or even mention of, the Plan's appeal procedure, Schwade attempted to defeat the Plan's subrogation right. In response, the Plan twice informed Schwade that subrogation was non-negotiable (Doc. 31 at 5), but Schwade—resolutely choosing not to appeal—continued to send letters asking the Plan to sacrifice the subrogation right. The Plan bore no obligation to keep responding to Schwade's pointless and unilateral posturing.

 Another argument that appears anew in Schwade's Rule 59(e) motion contends that after expiration of the appeal period the Plan still seemed willing to consider Schwade's claims if Schwade honored the Plan's right to subrogation. The Plan's perceived flexibility, says Schwade, precludes the Plan's arguing that the explanations of benefits officially denied the claims. Ironically, because she omits this waiver argument from her original response to the Plan's motion for summary judgment, Schwade now impermissibly advances a waived argument to the effect that the Plan advances a waived argument. That qualm aside, to establish whether a "waiver" argument under ERISA is even available, Schwade mentions only the avowedly uncertain *Glass v. United of Omaha Life Ins. Co.,* 33 F.3d 1341, 1348 (11th Cir.1994), which declines to decide whether federal common law waiver applies to ERISA. Schwade recommends that the reader "see also" the wholly inapposite *Burger v. Life Ins. Co. of North America,* 103 F.Supp.2d 1344, 1348 (N.D.Ga.2000), which employs waiver to preclude a plan's recovering benefit "overpayments" that the plan had voluntarily paid for three years. Without explanation Schwade invites the court to "consider

whether waiver principles apply." (Doc. 40 at 17) The waiver argument arrives late and inchoate.

Schwade tries several new variations of an argument that the exhaustion requirement is excusable because the Plan never issued a sufficiently explicit claim denial. Even if the Plan never explicitly denied a claim—and further, even if 29 C.F.R. § 2560.503–1($l$)'s "perfect compliance" requirement applies, and even if the Plan "waived" the appeal deadline that followed Schwade's receipt of explanations of benefits in 2007—this action remains barred by the exhaustion requirement. Both the Plan's terms and the ERISA regulation treat a "claim denial" and an "adverse benefit determination" as synonymous, (Doc. 3, Ex. 5 at 70–71); 29 C.F.R. § 2560.503–1(h)(1); *Midgett v. Wash. Group Intern. Long Term Disability Plan,* 561 F.3d 887, 894 (8th Cir.2009), and under the Plan an "adverse benefit determination" includes "a failure to provide or make payment, in whole or in part, for a benefit." (Doc. 3, Ex. 5 at 70) The 2007 explanations of benefits alerted Schwade that an "amount [was] not payable" (Doc. 31 at 20–21), and the 2008 letters confirmed that without a subrogation agreement the Plan would never pay the claims. *Cf. Springer v. Wal–Mart Assocs. Group Health Plan,* 908 F.2d 897, 899–901 (11th Cir.1990). On the one hand, if before receiving the Plan's letters in 2008 Schwade had "deemed" her administrative remedy exhausted and sued in federal court, whether 29 C.F.R. § 2560.503–1($l$) applies might matter. On the other hand, if in late 2008 Schwade had followed the Plan's appeal procedure, whether the Plan's "failure to provide or make payments" was official before the 2008 letters might matter. Neither occurred. Instead of suing in early 2008, Schwade wrote to the Plan for clarification and received a response unambiguously refusing payment absent a subrogation agreement. This rejection from the Plan

foreclosed Schwade's opportunity, if any, to "deem" the administrative remedy exhausted under 29 C.F.R. § 2560.503–1($l$). *See Tindell v. Tree of Life, Inc.,* 672 F.Supp.2d 1300, 1311–12 (M.D.Fla.2009) (Howard, J.) ("if the claimant waits for the plan administrator to issue a determination, then [notwithstanding 29 C.F.R. § 2560.503–1($l$) ] the claimant should pursue the administrative route to its end"); *Hall v. United of Omaha Life Ins. Co.,* 741 F.Supp.2d 1348, 1357–58 (N.D.Ga.2010) (same). Instead of challenging each claim denial by an appeal in late 2008, Schwade—in accord with the considered advice of counsel—waited more than three months, asked the Plan (not the appeal unit) to waive the subrogation requirement, waited more than a year, asked the Plan (not the appeal unit) to waive the subrogation requirement, waited nearly another year, and sued Total Plastics in November, 2010. Hence, even if the Plan's 2008 responses (and not the 2007 explanations of benefits) started the 180 days for appeal, Schwade's desultory (and enigmatic) colloquy with the Plan neither exhausted her administrative remedy nor excused the exhaustion of her administrative remedy.

The November 10th order concludes that an ERISA plan's terms are strictly construed, *Hunt v. Hawthorne Assocs., Inc.,* 119 F.3d 888, 911 (11th Cir.1997); that the Plan enjoys a "standard" ERISA plan subrogation right; and that the Plan explicitly entitles the Plan to deny a benefit if a beneficiary refuses subrogation. Schwade proposes that *US Airways, Inc. v. McCutchen,* 663 F.3d 671 (3d Cir.2011), which issued the week after the November 10th order, constitutes an "intervening change in the law" that undermines the Plan's subrogation right. According to Schwade, *McCutchen* "intervenes" by contradicting *Zurich American Insurance Company v. O'Hara,* 604 F.3d 1232 (11th

Cir.2010), a decision that the November 10th order cites frequently as support for enforcing the Plan's right to subrogation.

First, Schwade reverses herself. Moving for summary judgment, Total Plastics argued that *Cagle v. Bruner*, 112 F.3d 1510, 1519–20 (11th Cir.1997), validates the Plan's refusal to pay benefits without a subrogation. *Cagle* concludes that a subrogation provision nearly identical to the Plan's provision permits a plan to deny a benefit if the beneficiary refuses subrogation. Opposing summary judgment, Schwade claimed that *Cagle* "do[es] not apply under the facts of this case" because the beneficiary in *Cagle* "[first] obtained a recovery from a third-party and then sought to avoid the plan's subrogation interest." (Doc. 25 at 19) Before suing Total Plastics, Schwade obtained no third-party recovery. Like *Cagle*, *McCutchen*, on which Schwade now vigorously relies, involves a beneficiary who recovers from a third party and seeks to avoid the plan's subrogation interest. Schwade now applies wholeheartedly the same facts that she earlier applied not at all.

Further, in the 2008 letters to the Plan, Schwade's counsel "finds it hard to believe" that the Plan may require subrogation. Schwade now defends her counsel's statement, despite the Eleventh Circuit's controlling authority in *Cagle*, because under *McCutchen*, decided in 2011, counsel's statement "was correct in 2008." (Doc. 40 at 19) The claim that Schwade's letters correctly ignored then-current and binding Eleventh Circuit law in 2008 in anticipation of a late 2011 circuit split exhibits an unconvincing but singular revisionist hauteur, to put it mildly. *See* B. Fischhoff, "Debiasing," *Judgment Under Uncertainty: Heuristics and Biases* 422, 429 (Kahneman, Slovic, & Tversky, eds. 1982) ("one possible attraction of hindsight bias is that it may be quite flattering to represent oneself as having known all along what

was going to happen"). One "need hardly add that even if there [is] a relevant circuit split, the district court is bound by controlling *Eleventh Circuit* precedent." *Springer*, 908 F.2d at 900 n. 1 (emphasis in original). A fundament of maintaining stability in the law, obedience to circuit precedent (a discipline the Eleventh Circuit follows with rigor) is alone a sufficient reason to disregard *McCutchen*.

## II.

The irreconcilable difference between *O'Hara* and *McCutchen* merits focused attention. *O'Hara* obeys familiar rules of ERISA benefit plan interpretation, rules that protect and preserve the express terms of a plan (so that a plan means what a plan plainly says) and that generally respect the expertise and superior vantage of a plan's fiduciary, who (unlike a court) is well positioned to consider simultaneously the welfare of each plan beneficiary at each moment in the life of the plan. *McCutchen* exhibits two main features. First, *McCutchen* announces a broad, judicially manufactured alteration of ERISA (certain to increase the cost to each participant in each plan) based on a little-explained reading of several narrow Supreme Court decisions. Second, *McCutchen* revises a plan over the objection of the plan's managers, contrary to the interests of other participants, and on behalf of a single beneficiary.

O'Hara suffered a car accident, received medical benefits from his ERISA plan, and obtained a tort settlement. Although the settlement left O'Hara undercompensated for his injuries, the plan, invoking a subrogation provision, sued O'Hara for re-payment from the settlement under Section 502(a)(3) of ERISA, which allows a suit "by a participant, beneficiary, or fiduciary ... to obtain [ ] appropriate equitable relief (i) to redress [a violation of ERISA or

the terms of the ERISA plan] or (ii) to enforce any provisions of [ERISA] or the terms of the [ERISA] plan." O'Hara objected that subrogation would grant the plan more than "appropriate" equitable relief because any reimbursement had to come from an already insufficient settlement. 604 F.3d at 1236. O'Hara contended that "equity" prevents an "unjust enrichment" of the plan and demanded a compromise of the subrogation right. 604 F.3d at 1237. The Eleventh Circuit enforced the subrogation provision:

> O'Hara contends that, as a matter of equity . . . the make-whole rule must be applied because allowing [the Plan] to recoup the medical expenses it paid on his behalf . . . unjustly enriches [the Plan]. We disagree.
>
> . . . .
>
> We cannot conclude that . . . a balancing of the equities in this case requires application of the make-whole doctrine to defeat the Plan's unambiguous reimbursement requirement. Although O'Hara himself will be in a better position if the subrogation provision is not enforced, plan fiduciaries must take impartial account of the interests of all beneficiaries. Reimbursement inures to the benefit of all participants and beneficiaries by reducing the total cost of the Plan. . . . Plan fiduciaries must [ ] ensure that the assets of employee health plans are preserved in order to satisfy present and future claims. Because maintaining the financial viability of self-funded ERISA plans is often unfeasible in the absence of reimbursement and subrogation provisions like the one at issue in this case, denying [the Plan] its right to reimbursement would harm other plan members and beneficiaries by reducing the funds available to pay those claims. Moreover, O'Hara availed himself of the benefits of the Plan with the knowledge that the Plan would be entitled to full reimbursement for those

benefits in the event he was injured and received full or partial recovery from a third party tortfeasor. As the Third Circuit has pointed out, any inequity in this case would lie in permitting O'Hara "to partake of the benefits of the Plan and then after he had received a substantial settlement, invoke common law principles to establish a legal justification for his refusal to satisfy his end of the bargain." *Ryan v. Fed. Express Corp.*, 78 F.3d 123, 127–28 (3d Cir.1996); *see also* [*Admin. Comm. of Wal–Mart Stores, Inc. Assocs.' Health and Welfare Plan v. Shank*, 500 F.3d 834, 839 (8th Cir.2007) ] (enforcement of ERISA plan, which expressly precluded make-whole rule, was "appropriate" where plan "conferred benefits on both parties," by requiring payment of premiums plus a promise to reimburse the plan in exchange for the "certainty that the plan would pay beneficiary's medical bills immediately if beneficiary was injured").

*O'Hara*, 604 F.3d at 1237–38 (emphasis removed).

■ Much authority favors *O'Hara's* view of the pertinent equities. "In fashioning 'appropriate' equitable relief, [a court should] keep in mind the special nature and purpose of employee benefit plans." *Varity Corp. v. Howe*, 516 U.S. 489, 515, 116 S.Ct. 1065, 134 L.Ed.2d 130 (1996). "[Section 502(a)(3) ] does not, after all, authorize 'appropriate equitable relief' *at large*, but only 'appropriate equitable relief' for the purpose of redressing any violations or enforcing any provisions of ERISA or an ERISA plan." *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 253, 113 S.Ct. 2063, 124 L.Ed.2d 161 (1993) (emphasis in original). An employer volunteers to provide a plan; encouraging an employer to volunteer requires, as explained throughout ERISA's case law, both predictable regulation and reliable construction of the plan. As the Supreme Court explains:

We are mindful that ERISA does not create any substantive entitlement to employer-provided health benefits or any other kind of welfare benefits. Employers or other plan sponsors are generally free under ERISA, for any reason at any time, to adopt, modify, or terminate welfare plans. Nor does ERISA establish any minimum participation, vesting, or funding requirements for welfare plans.... *Curtiss–Wright Corp. v. Schoonejongen,* 514 U.S. 73, 78, 115 S.Ct. 1223, 131 L.Ed.2d 94 (1995) (citations omitted); *Conkright v. Frommert,* — U.S. —, —–––—, 130 S.Ct. 1640, 1648–49, 176 L.Ed.2d 469 (2010). In consequence, ERISA aims at "inducing employers to offer benefits by assuring a predictable set of liabilities under uniform standards of primary conduct and a uniform regime of ultimate remedial orders and awards when a violation has occurred." *Rush Prudential HMO, Inc. v. Moran,* 536 U.S. 355, 379, 122 S.Ct. 2151, 153 L.Ed.2d 375 (2002) (citations omitted).

 The terms "appropriate equitable relief" smuggle into ERISA no free-floating equitable principle that operates in each case independently of ERISA's larger purpose and structure. As *Rush* notes, ERISA demands predictable liabilities, uniform standards, and uniform remedies. An untamed sense of "equity," detached from ERISA's purpose and context, is antithetical to ERISA because every man's notion of equity is uncertain and variable. "Congress sought to create a system that is not so complex that ... litigation expenses[ ] unduly discourage employers from offering ERISA plans in the first place." *Conkright,* 130 S.Ct. at 1649.

McCutchen suffered a car accident, received medical benefits from his ERISA plan, and recovered money from third parties. Like O'Hara, McCutchen recovered less than full compensation for his injuries, and like O'Hara's ERISA plan, McCutchen's ERISA plan sued under Section 502(a)(3). McCutchen advocated judicially modifying the plan's subrogation right to prevent "unjust enrichment." The Third Circuit agreed with McCutchen and ordered the district court to curtail McCutchen's obligation to subrogate the plan. 663 F.3d at 676–77. *McCutchen* faults *O'Hara* for failing to ask "whether the relief sought in the action is 'appropriate' under traditional equitable principles and doctrines." According to the Third Circuit, *O'Hara* erred by "categorically excluding the equitable limitations that § 502(a)(3)'s reference to equitable remedies necessarily contains." 663 F.3d at 678.

Although *McCutchen* claims to reject *O'Hara* for "categorically excluding" an "equitable limitation" in favor of a beneficiary, *O'Hara* carefully "balances the equities." *McCutchen* appears to reject as insufficiently sympathetic to the beneficiary both *O'Hara's* rich analysis of "equitable principles" and *O'Hara's* reasoned exclusion of an "equitable limitation."

In *McCutchen's* view, four Supreme Court decisions, *Mertens v. Hewitt Associates,* 508 U.S. 248, 113 S.Ct. 2063, 124 L.Ed.2d 161 (1993), *Great–West Life & Annuity Ins. Co. v. Knudson,* 534 U.S. 204, 218, 122 S.Ct. 708, 151 L.Ed.2d 635 (2002), *Sereboff v. Mid Atlantic Medical Services,* 547 U.S. 356, 126 S.Ct. 1869, 164 L.Ed.2d 612 (2006), and *CIGNA Corp. v. Amara,* — U.S. —, —, 131 S.Ct. 1866, 1878, 179 L.Ed.2d 843 (2011), find "equitable principles" in Section 502(a)(3) that favor a beneficiary and disfavor the plan. These decisions discuss the meaning of "equitable relief" in Section 502(a)(3), but explain only that "equitable relief" includes no traditionally "legal relief." These decisions mention "appropriate" equitable relief, but decline to discuss how or

whether "appropriate" modifies "equitable relief." *CIGNA* allows a court to remedy a plan's fraud against beneficiaries, but says nothing more—certainly nothing applicable to a case such as McCutchen's, in which the plan acts entirely in accord with a contractual right. *McCutchen* concludes that the Supreme Court through subtle hints sharply limited a fiduciary's right to enforce an ERISA plan. *Mertens, Knudson, Sereboff,* and *CIGNA* at no point support *McCutchen's* claim that a court applying Section 502(a)(3) now enjoys broad power to alter the terms of the plan in favor of a beneficiary based on an amorphous notion of fairness.

In order to provide an unprecedented advantage to a beneficiary, *McCutchen* ignores equitable factors that apply to ERISA; *O'Hara* considers the proper factors and rightly rejects a beneficiary's unjust enrichment. *O'Hara* understands that the certainty and uniformity needed for ERISA to operate properly qualify as important "equitable principles" that a court cannot ignore when considering an action under Section 502(a)(3).

*McCutchen* balances the equities as follows:

> [The plan] raises a practical concern that the application of equitable principles will increase plan costs and premiums. This concern does not address the statutory language and is, in any event, unsubstantiated by the circumstances of this case. [The plan] cannot plausibly claim it charged lower premiums because it anticipated a windfall.

. . . .

Applying the traditional equitable principle of unjust enrichment, we conclude that the judgment requiring McCutchen to provide full reimbursement to [the plan] constitutes inappropriate and inequitable relief. Because the amount of the judgment exceeds the net amount of McCutchen's third-party recovery, it leaves him with less than full payment for his emergency medical bills, thus undermining the entire purpose of the Plan. At the same time, it amounts to a windfall for [the plan], which did not exercise its subrogation rights or contribute to the cost of obtaining the third-party recovery. Equity abhors a windfall.

663 F.3d at 679 (citation omitted).

■■ First, "nothing in the statute suggests Congress intended that section 502(a)(3)'s limitation of the [plan's] recovery to 'appropriate equitable relief' would upset [ ] contractually defined expectations. Indeed, ERISA's mandate that 'every employee benefit plan shall be established and maintained pursuant to a written instrument,' 29 U.S.C. § 1102(a)(1), establishes the primacy of the written plan." *Shank,* 500 F.3d at 839; *see also Morales v. Pan American Life Ins. Co.,* 914 F.2d 83, 87 (5th Cir. 1990) (concluding that Section 502(a) "focuses on the terms of the plan" and includes "no provision . . . for quasi-contractual damages" based on an unjust enrichment).* Further, as discussed,

---

* Schwade seeks relief similar to McCutchen's, but preemptively—before receiving benefits. *McCutchen* states that Congress in Section 502(a)(3) "limited" a fiduciary to "appropriate equitable relief," but Section 502(a)(3) "limits" a participant, a beneficiary, and a fiduciary; each may receive only "appropriate equitable relief" "to enforce . . . the terms of the plan." If Schwade had sued for "appropriate equitable relief" under Section 502(a)(3), under no remotely plausible reading of Section 502(a)(3) would Schwade seek "appropriate equitable relief" to "enforce the terms of the plan." Schwade seeks to *escape* a term of the plan. To allow Schwade to "enforce" the plan by changing the plan requires a *"carte blanche* power to rewrite [ERISA] to satisfy [the court's] proclivities." *Coop. Ben. Adm'rs, Inc. v. Ogden,* 367 F.3d 323, 329–30 (5th Cir.2004). But "the author-

controlling plan cost is an "equitable principle"; in the context of ERISA, controlling plan cost is a paramount equitable principle. The text of Section 502(a)(3) shows the importance of cost; why, if not to control the cost of the plan, would Section 502(a)(3) allow a beneficiary "appropriate equitable relief" only "to enforce ... the terms of the plan"? *See Hozier v. Midwest Fasteners, Inc.*, 908 F.2d 1155, 1160 (3d Cir. 1990) ("Congress analyzed all of the provisions in ERISA on the basis of their projected costs in relation to the anticipated benefit to the employee participant") (quoting H.R.Rep. No. 533, 93rd Cong., 2d Sess., *reprinted,* 1974 U.S.C.C.A.N. at 4639–40).

*McCutchen* produces trouble by claiming that a concern about costs is "unsubstantiated by the circumstances of this case." By nullifying the plan's subrogation right, *McCutchen* leaves other beneficiaries worse off. If a plan cannot trust a court to enforce a subrogation right, a beneficiary cannot receive lower premiums or better benefits in exchange for pledging to re-pay the plan from a tort award or an insurance payment. *See* Easterbrook, *The Court and the Economic System,* 98 Harv. L.Rev. 4, 10–11 (1984). Even worse, higher premiums will rise even higher and worse benefits will worsen even further because *McCutchen* likely increases each plan's litigation cost (and heightens each plan administrator's anxiety). For each person whom a court in "fairness" allows to skip re-payment, there will blossom many lawsuits from others who aspire to skip re-payment (and why not; they may get lucky; under *McCutchen,* all depends—the ERISA plan aside—on the contingency of a court's conscience). The losers, again, are the other beneficiaries.

Judge Easterbrook provides an apt warning:

The nature of litigation invites judges to treat the parties' circumstances as fixed and to apportion gains and losses.... [But] the principles laid down today will influence whether similar parties will be in similar situations tomorrow. [ ] Judges who look at cases merely as occasions for the fair apportionment of gains and loses almost invariably ensure that there will be fewer gains and more losses tomorrow.

*supra,* 98 Harv. L.Rev. at 10–11; *see Evans v. Eaton Corp. Long Term Disability Plan,* 514 F.3d 315, 323 (4th Cir.2008) (A court must not "forget its duty of deference and its secondary rather than primary role in determining a claimant's rights to benefits").

*McCutchen* asserts the puzzling notion that the plan "cannot plausibly claim it charged lower premiums because it anticipated a windfall." Were McCutchen's employer compelled to provide a plan, were that plan immune from insolvency, were money but manna from heaven, the pejorative term "windfall" might apply. Needless to say, none of those assumptions is true. *McCutchen* leaves a mystery: How can a plan obtain a "windfall" by merely enforcing a contractual right that protects plan assets? "Windfall" means unearned money; McCutchen's ERISA plan sought reimbursement of money paid by the plan and owed by McCutchen. In fact, *McCutchen* both preserves a windfall (McCutchen holds other beneficiaries' money) and ensures the creation of future windfalls. "Deference to plan administrators, who have a duty to all beneficiaries to preserve limited plan assets, [ ] helps prevent [a] windfall[ ] for particular employees." *Conkright,* 130 S.Ct. at 1650. Con-

ity of courts to develop a 'federal common law' under ERISA is not the authority to

revise the text of the statute." *Mertens,* 508 U.S. at 259, 113 S.Ct. 2063.

versely, if *McCutchen's* ungoverned notion of equity becomes pandemic, consistent plan operation becomes impossible, inconsistent judicial ruling becomes commonplace, and some beneficiaries become profiteers at the expense of others.

*McCutchen* answers that subrogating the plan produces a windfall because subrogation occurs without an "exercise [of the plan's] subrogation rights" and without the plan's contributing to McCutchen's attorney fees. How the plan never exercised a subrogation right is obscure; McCutchen's plan at each moment enjoyed an unconditional right to subrogation— without stepping into McCutchen's shoes to sue and without requiring McCutchen to sign a supplemental subrogation agreement. As for the plan's declining to pay a portion of McCutchen's attorney fees, the plan merely acted in accord with the parties' bargain. McCutchen's situation appears unfair only if viewed in hindsight and without a thought for whether McCutchen's agreeing to join the plan benefitted McCutchen at the time he agreed to join. At that time, McCutchen "traded the possibility of having the Plan participate in attorney's fees for the guarantee that medical bills would be paid immediately," *Admin. Comm. of Wal–Mart Stores, Inc. Assocs. Health and Welfare Plan v. Varco*, 338 F.3d 680, 692 (7th Cir.2003)—an appealing trade for the plan to offer, a rational trade for McCutchen to accept, and therefore a beneficial trade not susceptible to dissolution or avoidance by the operation of equity.

For the Third Circuit to say that McCutchen's paying his remaining medical bills undermines "the entire purpose of the Plan" assumes replacement of the plan's actual purpose with the Third Circuit's idealized purpose. McCutchen's plan states, "the purpose of the Plan is to provide coverage for qualified expenses that are not covered by a third party." 663 F.3d at 673. "Qualified" expenses; not "all" expenses. McCutchen's plan—like Schwade's plan—supplies only a defined benefit; the plan includes no guarantee to "make whole" a beneficiary. "The make-whole doctrine originated in the law of insurance, where the overriding purpose of an insurance policy is to fully compensate the insured in case of loss, but [ ] many ERISA-regulated benefit plans do not share that purpose." *Shank*, 500 F.3d at 837–38. The Third Circuit divines *ex nihilo* the plan's supposed obligation to erase McCutchen's residual medical bill. Although perhaps momentarily gratifying to the sensibilities of a judge, foisting an involuntary and unpredictable obligation on an ERISA plan endangers both the statutory ERISA regime and the salutary benefits broadly available as a result of the regime.

The Third Circuit notes that the plan's subrogation right possibly entitled the plan to a payment "from McCutchen's pocket" (only "possibly" because McCutchen never disclosed the amount of disbursements to him from either his insurance or his lawsuit). 663 F.3d at 673, 677 n. 3. That appears an important distinction, but only at first. The typical person losing from his pocket a thousand dollars of past earnings feels more aggrieved than a person losing from a settlement a thousand dollars meant to compensate lost future earnings. A person palpably possesses the former and palpably feels the loss; a person only abstractly possesses the latter and more abstractly feels the loss. *See O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft*, 389 F.3d 973, 1016 (10th Cir.2004) (McConnell, J., concurring) (discussing "loss aversion"—"the tendency to attach greater value to losses than to foregone gains of equal amount"); Cohen & Knetsch, *Judicial Choice and Disparities Between Measures of Economic Values*, 30 Osgoode Hall L.J. 738 (1992).

However, McCutchen's re-paying his plan with past wages leaves him little or no worse off than, for example, O'Hara, who re-paid his plan with settlement money that compensates lost future wages.

In any event (and most importantly), in exchange for the enjoyment of the plan's paying an immediate and near-certain benefit after an injury, a beneficiary bears the risk of a subsequent lawsuit against a third party. If the beneficiary's recovery pays both the plan and the beneficiary's lawyers and leaves a remainder, the beneficiary reaps the benefit. But the beneficiary undertakes the lawsuit at the risk that the lawsuit will generate less money for the beneficiary—especially, after the lawyers extract a fee, probably near forty percent—than the amount of money owed to the plan. If the beneficiary recovers a small amount, the plan bears no responsibility for the undesirable consequence of the beneficiary's choice to sue. Bearing the obligation to reimburse the plan, will a beneficiary struggle to find a lawyer willing to assume the risk of the suit? Probably not. And if the small size of the potential award leaves no attorney willing to share the beneficiary's risk, this merely shows that the beneficiary correctly chose an immediate and safe benefit from the plan rather than an uncertain tort award (and the cumbrous, enervating, and expensive machinery of litigation) as the means of paying his medical bill. Although perhaps imperfect in the arcane circumstance, ERISA is a salutary and stalwart aid to almost every beneficiary—unless the judges foul it up by tinkering.

Based on a dubious reading of recent Supreme Court decisions, McCutchen mischievously expands a beneficiary's ability to avoid re-paying an ERISA plan for medical benefits paid to the beneficiary with promptness and certainty. Even if Section 502(a)(3) of ERISA bestows broad discretion to alter a plan, McCutchen abuses that discretion by favoring affective over statistical judgment and a retrospective over a prospective view of fair contract. The misjudgments serve a hollow and counterproductive sense of "fairness" that ignores those with the most knowledge of what is truly "fair"—which is to say, of maximum benefit to each beneficiary rather than to a single, contract-breaking claimant. In muscling aside established law, McCutchen invokes the venerable axioms of equity, but equity neither contrives to indulge the disqualified ERISA applicant of today nor contrives to burden the qualified ERISA applicant of tomorrow; McCutchen contrives to effect both. The wisdom and restraint of O'Hara govern here.

Schwade's motion (Doc. 40) is **DENIED.** February 22, 2012.